*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0125p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GALE EDGAR,

*Plaintiff-Appellant,*

No. 05-1193

*v.*

JAC PRODUCTS, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-73136—John Corbett O'Meara, District Judge.

Argued: March 17, 2006

Decided and Filed: April 6, 2006

Before: DAUGHTREY and GILMAN, Circuit Judges; RUSSELL, District Judge.[*]

---

**COUNSEL**

---

**ARGUED:** Megan A. Bonanni, PITT, DOWTY, McGEHEE, MIRER & PALMER, Royal Oak, Michigan, for Appellant. Jennifer J. Dawson, MARSHALL & MELHORN, Toledo, Ohio, for Appellee. **ON BRIEF:** Megan A. Bonanni, PITT, DOWTY, McGEHEE, MIRER & PALMER, Royal Oak, Michigan, for Appellant. Jennifer J. Dawson, MARSHALL & MELHORN, Toledo, Ohio, for Appellee.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. Gale Edgar sued her former employer, JAC Products, Inc., based upon an alleged violation of the Family Medical Leave Act (FMLA) after she was fired in October of 2002. The district court granted summary judgment in favor of JAC, concluding that Edgar was not entitled to relief under the FMLA because she was unable to return to work after the 12-week period of statutory leave had ended. On appeal, Edgar argues that her ability to resume her duties is a disputed question of fact that the district court improperly resolved in JAC's favor. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

---

[*]The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

# I. BACKGROUND

## A.          Factual background

Gale Edgar began working for JAC, a manufacturer of specialized automotive products, as an assembler in October of 1984. She later worked as a corporate-quality administrator, a job that she held until the position was eliminated in 2001. At that point, Edgar accepted a transfer to JAC's finance department, where she worked as an accounts-payable clerk.

Edgar began to suffer from work-related stress after her transfer, but refused another transfer to the newly created position of material-data coordinator. On September 16, 2002, her family doctor, Linda Speegle, diagnosed Edgar as suffering from high blood pressure and anxiety. She recommended that Edgar be excused from work through September 29, 2002. Edgar did not heed Speegle's advice, instead deciding to continue working because she "knew that there was nobody [who] could do the check run" set for that week. Dr. Speegle met with Edgar again on September 19, 2002, diagnosed her with "anxiety and an adjustment reaction related to increased [stress] at work," and recommended that her leave be extended through October 6, 2002.

The following morning, Edgar called her supervisor, Cindy Irish, and informed Irish that she would be missing work due to "high blood pressure and anxiety disorder." Irish asked Edgar to come into the office early the following week to answer some questions and to deliver the doctor's note justifying her absence. When Edgar entered the building on September 24, 2002, she was escorted by Jodee Szodza, the Corporate Compensation and Benefits Manager, to a meeting with Szozda and Dennis Kaye, JAC's Corporate Director of Human Resources.

What actually transpired at the meeting is the subject of dispute between the parties. JAC maintains that Kaye and Szozda explained to Edgar her rights and responsibilities under the FMLA, handed her two forms, and instructed her to fill out the forms and return them to JAC. The forms in question were the JAC Products Request for Family or Medical Leave form and a Certification of Health Care Provider form issued by the Department of Labor. JAC's form included a "Note" informing employees that leave requests "must be accompanied by a verifying medical certification from a physician" and that "failure to provide the requested certification within 15 days of the request may result in termination of employment." Edgar acknowledges receiving the forms, but insists that she "didn't understand what was going on," that she was confused because the FMLA procedure differed from the company's previous practice, and that the situation "was very stressful" because her young daughter was with her.

Dr. Speegle examined Edgar again on October 3, 2002, concluding that Edgar continued to suffer from anxiety, dizziness, and insomnia. She extended Edgar's leave until October 14, 2002, by which date Edgar was to have been evaluated by a psychiatrist. Edgar immediately provided Dr. Speegle's updated note to JAC along with the company's Request for Family or Medical Leave form. JAC approved Edgar's requested leave on October 3, 2002. Edgar had not, however, turned in the required medical certification form. On October 7, 2002, JAC mailed her a correct version of the form (because the one given to her at the September 24, 2002 meeting was no longer the one recommended by the Department of Labor) and instructed her to return the form by October 11, 2002, two days after the 15-day deadline would have passed.

Edgar did not receive the updated form until Friday, October 11, 2002. She immediately called Szodza and left a voicemail message explaining that she had just received the form and that she would need an extension. Szodza returned her call the following Monday and, after consulting with Kaye, agreed to give her an extension. The parties dispute the length of the promised extension, with Edgar insisting that Szozda provided a deadline of October 21, 2002, while JAC maintains that Szozda set the deadline for October 18, 2002 as reflected in a memorandum that he

placed in Edgar's personnel file. These conflicting versions of the final medical certification deadline led the district court to conclude that a genuine issue of material fact existed that precluded the entry of summary judgment in favor of JAC.

In an effort to comply with the new deadline, Edgar asked Dr. Speegle to fill out the updated medical certification form. Dr. Speegle told Edgar that her office would call when the form was ready. Edgar called Dr. Speegle three times over the next two days and finally arranged for her husband to pick up the completed form on October 21, 2002—the day that Edgar believed marked the deadline for submitting the form. The form, according to Edgar's husband, was picked up from the doctor and delivered by hand to JAC on October 21, 2002, but the company insists that its records reveal that the form was not received until the following day. Kaye mailed a letter on October 21, 2002 terminating Edgar's employment due to her failure to provide the requested medical certification by the October 18, 2002 deadline allegedly set by JAC.

Meanwhile, Edgar was unable to meet with the psychiatrist, Dr. Barbara Day, as scheduled on October 22, 2002. Dr. Day finally evaluated Edgar on October 29, 2002, diagnosed her with "major depression," and determined that she would not be able to return to work until January 16, 2003. After a subsequent examination in December of 2002, Dr. Day extended Edgar's medical leave of absence until February 10, 2003. A second psychiatrist, Dr. Jeri Kedzierski, began treating Edgar in February of 2003. Dr. Kedzierski treated Edgar for approximately a year and finally "released her to work at full capacity as of March 4, 2004," which was 15 months after the expiration of the FMLA-leave period.

## B.      Procedural background

In the meantime, Edgar had filed her complaint in the Michigan state-court system in July of 2003. She alleged that JAC had violated the FMLA in four ways: (1) by failing to provide her with written notice of her FMLA rights, (2) by failing to provide her with sufficient time to submit the required medical certification form, (3) by interfering with the exercise of her rights under the statute, and (4) by terminating her employment in violation of the statute. The following month, JAC removed the case to federal court and filed its answer. JAC later filed a motion for summary judgment, asserting that it was entitled to judgment as a matter of law because (1) Edgar had failed to provide the required medical certification in accordance with the established deadline, and (2) even if the certification was timely, Edgar suffered no harm from JAC's termination decision because she would not have been able to return to her position at the end of the 12-week period of statutory leave in any event, and thus would have been terminated at that time.

The district court granted JAC's motion for summary judgment in an opinion and order filed in December of 2004. Because of conflicting testimony as to whether Szozda had extended the deadline for filing the requested medical certification form until as late as October 21, 2002, the district court ruled that material facts were in dispute as to Edgar's compliance with the certification requirement. *See generally Frazier v. Honda of Am. Mfg., Inc.*, 431 F.3d 563, 566 (6th Cir. 2005) (holding that the employer had given the employee "more time than was required under the FMLA regulations" by making a written request for a medical certification after the employer's oral request initially triggered the 15-day deadline).

The district court concluded, however, that JAC was entitled to summary judgment on the alternative ground that Edgar "was not released to return to work at the time her leave would have ended [and therefore] ha[d] no claim under the FMLA." In so ruling, the district court relied on this court's opinion in *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775 (6th Cir. 1998), and two district court opinions. Edgar's timely appeal followed.

## II.  ANALYSIS

### A.      Standard of review

The district court's grant of summary judgment is reviewed de novo.  *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006).  Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.      Statutory and legal framework

"The FMLA entitles qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting 29 U.S.C. § 2612(a)(1)(D)).  A "serious health condition," in turn, is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).  Employees claiming that they suffer from such a condition may be required by their employer to support their contention with a written certification from a healthcare provider.  29 U.S.C. § 2613(a).  That certification form, according to the Department of Labor (DOL) regulations, must be submitted "within the time frame requested by the employer (which must allow at least 15 calendar days after the employer's request), unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts." 29 C.F.R § 825.305(b); *see also Frazier*, 431 F.3d at 566 (explaining the 15-day rule).

The other relevant time frame under the FMLA is the 12-week period of statutory leave. Qualifying employees who return to work within that 12-week period are entitled to be reinstated to their previous position, or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1).  Once the 12-week period ends, however, employees who remain "unable to perform an essential function of the position because of a physical or mental condition . . . [have] no right to restoration to another position under the FMLA." 29 C.F.R. § 825.214(b).

This court has consequently held that an employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave. *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 784-85 (6th Cir. 1998) (finding no FMLA violation because the evidence was undisputed that the employee would not have been able to return to work by the statutory deadline); *Williams v. Toyota Motor Mfg., Ky., Inc.*, 224 F.3d 840, 845 (6th Cir. 2000) (concluding that the employee had suffered no harm when she was terminated because she was unable to resume her duties by the end of the FMLA leave period), *rev'd on other grounds*, 534 U.S. 184 (2002).

Section 105 of the FMLA, codified at 29 U.S.C. § 2615, prohibits covered employers from interfering with, restraining, or denying the exercise of their employees' rights under the statute, and also makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  29 U.S.C. § 2615(a)(1), (a)(2), (b).  These provisions are enforceable under § 107 of the FMLA, which (1) imposes liability on "[a]ny employer who violates [29 U.S.C.] section 2615," and (2) provides an

individual right of action to sue in state or federal court. 29 U.S.C. § 2617(a)(1), (a)(2). Two distinct theories of recovery arise under these statutes. *See Arban v. West Pub. Co.*, 345 F.3d 390, 400-401 (6th Cir. 2003) (explaining the entitlement and retaliation theories of recovery under the FMLA); *see also Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 977-78 (8th Cir. 2005) (same).

Under the entitlement theory (which some courts refer to as the interference theory), "[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA—for example, a twelve-week leave or reinstatement after taking a medical leave." *Arban*, 345 F.3d at 401. The right to reinstatement guaranteed by 29 U.S.C. § 2614(a)(1) is the linchpin of the entitlement theory because "the FMLA does not provide leave for leave's sake, but instead provides leave with an expectation [that] an employee will return to work after the leave ends." *Throneberry*, 403 F.3d at 978; *see also* 29 C.F.R. § 825.216(a) (explaining that employers are permitted to "deny restoration to employment" if they can "show that an employee would not otherwise have been employed at the time reinstatement is requested").

To prevail on an entitlement claim, an employee must prove that: (1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled. *See Walton*, 424 F.3d at 485 (citing *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003)). Only the last of those five issues is currently in contention—namely, whether JAC's termination of Edgar's employment denied her the FMLA benefits to which she was entitled. *See Walton*, 424 F.3d at 485.

The employer's intent is not a relevant part of the entitlement inquiry under § 2615. *See Arban*, 345 F.3d at 401 ("Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer.") (citing *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998)). By the same token, the FMLA is not a strict-liability statute. *See Throneberry*, 403 F.3d at 977 (rejecting the argument that employers are strictly liable for all FMLA violations); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 961 (10th Cir. 2002) (holding that employees "may be dismissed" so long as "the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave"). Employees seeking relief under the entitlement theory must therefore establish that the employer's violation caused them harm. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) ("[Section] 2617 provides no relief unless the employee has been prejudiced by the violation . . . .").

Both the statute and the DOL regulation likewise establish that interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct. *See Arban*, 345 F.3d at 401 ("An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave."); *accord Throneberry*, 403 F.3d at 979 ("As long as an employer can show a lawful reason, i.e., a reason unrelated to an employee's exercise of FMLA rights, for not restoring an employee on FMLA leave to her position, the employer will be justified to interfere with an employee's FMLA leave rights.").

Under the retaliation theory (also known as the discrimination theory), in contrast, the employer's motive *is* an integral part of the analysis. *See Hodgens*, 144 F.3d at 160 (explaining that in retaliation cases, "the employer's motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason"). The employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights. *See Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 885 (7th Cir. 2005) (observing that the retaliation theory

applies where a company seeks to punish an employee "for exercising rights or opposing an unlawful procedure").

This court applies the familiar burden-shifting test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to retaliation claims under the FMLA. *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313-16 (6th Cir. 2001) (applying the burden-shifting analysis to an FMLA-retaliation suit). Edgar can make out a prima facie case of discrimination by showing that (1) she availed herself of a protected right under the FMLA by notifying JAC of her intent to take leave, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action. *See id.* at 314 (setting forth this framework); *Rodriguez v. Ford Motor Co.*, 382 F. Supp. 2d 928, 933 (E.D. Mich. 2005) (applying this test to a retaliatory-discharge claim under the FMLA). If the employee satisfies these three requirements, the burden shifts to the employer to proffer a legitimate, nondiscriminatory rationale for discharging the employee. *Skrjanc*, 314 F.3d at 315.

**C.    The district court did not err in concluding that no genuine issues of material fact were in dispute regarding Edgar's ability to return to work**

The district court did not evaluate Edgar's claim under either the entitlement or the retaliation mode of analysis. Instead, the district court (1) relied on this court's decision in *Cehrs* for the proposition that an employer can lawfully fire an employee who is unable to return to work at the end of the FMLA leave period, even if the termination occurs before the end of the period, and (2) rejected Edgar's theory that her case was distinguishable because the condition that prevented her from returning to work was "exacerbated" by the firing. We will follow the same order in evaluating the district court's grant of summary judgment.

*1.     Is Edgar's claim foreclosed by* **Cehrs** *and its progeny?*

In *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 784-85 (6th Cir. 1998), this court held that a company does not violate the FMLA when it terminates an employee who is incapable of returning to work at the end of the 12-week leave period allowed by the Act. The plaintiff in *Cehrs* was a nurse at an Alzheimer's research facility who suffered from a chronic ailment that prevented her from working when it flared up. *Id.* at 777. Although the parties disputed the precise date on which Cehrs's employment was terminated, the evidence indisputably showed that she was not released to resume her duties until March 1, 1994—over two weeks after her FMLA leave period ended. *Id.* at 778. This court held that, because "Cehrs was clearly unable to return to work within the period provided by the FMLA," the defendant was entitled to summary judgment on the FMLA claim. *Id.* at 785.

Two unpublished decisions of this court have applied *Cehrs* to analogous factual scenarios. *See Hicks v. Leroy's Jewelers, Inc.*, No. 98-6596, 2000 WL 1033029 (6th Cir. July 17, 2000) (per curiam)*; Green v. Alcan Aluminum Corp.*, No. 98-3775, 1999 WL 1073686 (6th Cir. Nov. 16, 1999). In *Hicks*, the pregnant plaintiff requested FMLA leave in advance of the anticipated birth of her child. Her employer, however, placed her on FMLA leave when a kidney infection required her to be hospitalized almost one month before she gave birth. 2000 WL 1033029, at *1. This court held that, although the district court had erred in granting summary judgment on the ground that the employee's hospital stay allowed the employer to move up the start date of the leave period, the employer was nevertheless entitled to summary judgment because the employee could not have returned to work until at least 10 days after the leave period ended even if the employer had used the correct date. *Id.* at *3-*5.

In so holding, the court in *Hicks* relied on both *Cehrs* and 29 C.F.R. § 825.214(b). The latter is a DOL regulation establishing that employees who remain unable to perform an essential function

of their position have no statutory right to restoration under the FMLA. *Id* at \*5; *see also Green*, 1999 WL 1073686, at \*2 (relying on *Cehrs* and the DOL regulation to reject a claim by an employee who was not cleared to resume her duties until three weeks after the leave period expired); *Reynolds v. Phillips & Temro Indus., Inc.*, 195 F.3d 411, 414 (8th Cir. 1999) (relying on the DOL regulation to reject a claim by an employee who could not perform an essential function of his previous position for several months after the expiration of the FMLA-leave period).

Another panel of this court reached the same conclusion announced in *Cehrs* without citing that decision. *See Williams v. Toyota Motor Mfg., Ky., Inc.*, 224 F.3d 840, 845 (6th Cir. 2000), *rev'd on other grounds*, 534 U.S. 184 (2002). The plaintiff in *Williams* worked at a Toyota assembly plant. *Id.* at 842. She suffered from carpal-tunnel syndrome and tendinitis in her hands and arms, ailments that led her doctors to recommend that she cease all work as of December 6, 1996. *Id.* at 845. Even though the defendant fired Williams with time still remaining in the FMLA-leave period, this court affirmed the grant of summary judgment in the employer's favor. *Id.* The court emphasized that the evidence demonstrated that Williams "was restricted at the time of her termination and up until at least nine months later from doing any work of any kind, not even office jobs." *Id.* Because Williams "suffered no damages," the employer was entitled to summary judgment even if it had "improperly denied [Williams] FMLA leave." *Id.* at 844.

Edgar attempts to distinguish the *Cehrs* line of cases by limiting those precedents to situations in which no dispute exists as to whether the employee could resume her duties by the end of the FMLA-leave period. She relies instead on district court cases holding, unsurprisingly, that factual disputes regarding the employee's ability to return to work preclude summary judgment in favor of the employer. *See, e.g.*, *Mendoza v. Micro Electric, Inc.*, No. 02 C 8005, 2005 WL 331585 (N.D. Ill. Feb. 8, 2005) (unpublished); *Shepherd v. Honda of Am. Mfg., Inc.*, 160 F. Supp. 2d 860 (S.D. Ohio 2001); *Viereck v. City of Gloucester City*, 961 F. Supp. 703 (D. N.J. 1997)). As JAC persuasively demonstrates in its brief, however, both *Mendoza* and *Viereck* are factually distinguishable from the present case. In those two cases, the plaintiffs testified unequivocally that they would have returned to work by the end of the leave period if they had known that their jobs were at stake, and the employers could not demonstrate that the employees were medically unable to resume their positions. *See Mendoza*, 2005 WL 331585, at \*5-\*6; *Viereck*, 961 F. Supp. at 709.

The plaintiff in the present case, in contrast, has not pointed to any competent proof that contradicts the testimony of Drs. Day and Kedzierski. Both of those doctors were of the opinion that Edgar could not return to work until well after the FMLA-leave period had expired in December of 2002. Edgar instead relies on a statement in her own deposition testimony where she claimed that she would have been able to timely resume her duties. She acknowledged, however, that she was unaware of "what [her] doctors would have wrote down there to that respect." She also relies on an ambiguous answer given by Dr. Day, who said that she had no reason to doubt Edgar's statement that she "was prepared or preparing to return to work" when JAC terminated her. Dr. Day did not state, however, that Edgar could actually have returned to work. This testimony is therefore insufficient to establish that any mental health professional had released Edgar for work during the leave period, and does not contradict the consistent diagnoses of Drs. Day and Kedzierski.

Contrary to the distinguishable nature of *Mendoza* and *Viereck*, the district court decision in *Shepherd* does lend a degree of support to Edgar's position. The plaintiff in *Shepherd*, like Edgar, suffered from clinical depression. 160 F. Supp. 2d at 864. Shepherd took intermittent periods of leave until May of 1998, after which she could not return to work. These leave periods accounted for 54 of the 60 business days to which Shepherd was entitled under the FMLA. *Id.* at 872. Honda considered Shepherd to be on an unauthorized leave of absence because she did not submit the required medical documentation. An extension was granted until June 26, 1998 to allow Shepherd's doctor time to regulate her medication, *id.* at 864, but Shepherd still did not return to work. Shepherd was fired at the end of the extension period. *Id.*

Seeking judgment as a matter of law after the jury had returned a verdict in Shepherd's favor, Honda argued that Shepherd was unable to perform the functions of her position both at the time of her firing and for two years after that event. *Id.* The district court denied Honda's motion and upheld the jury verdict. In so ruling, the court rejected Honda's invocation of the *Cehrs* defense, emphasizing that the defense was "based upon evidence revealed after Plaintiff was terminated." *Id.* at 873. At the time of the firing, Shepherd's treating physician indicated that a medical leave of 25 days would suffice, although he opined months later that she would need at least 18 months of leave before returning part-time and 2 years before resuming her duties on a full-time basis. *Shepherd*, 160 F. Supp. 2d at 865. The court concluded that, because Shepherd's ability to return to work was disputed at the time of her firing, the jury could have found that the termination violated the FMLA. It therefore ruled that the *Cehrs* defense did not apply. *Id.* at 873.

There is, however, an important procedural difference between the present case and *Shepherd*. The district court in *Shepherd* was deciding whether the employer was entitled to judgment as a matter of law after the jury returned a verdict in favor of the employee on the FMLA claim. This court has recognized that a jury verdict in an FMLA case—rendered after consideration of the evidence and the credibility of the witnesses—stands on firmer ground than do a plaintiff's allegations and accompanying materials at the summary-judgment stage. *See Chandler v. Specialty Tires of Am. (Tenn.), Inc.*, 283 F.3d 818, 826 (6th Cir. 2002) (affirming the denial of the employer's motion for judgment as a matter of law on an FMLA claim in part because the employer "had ample opportunity to support is position that [the employee] was fired for taking a drug overdose, and not for taking [FMLA] leave"). Despite this procedural distinction, *Shepherd*'s operative facts are similar to the ones in the present case, and the legal analysis applied by the district court in *Shepherd* differs significantly from the one undertaken by the court below. Whether or not *Shepherd* accurately applied the law of this circuit is therefore an issue that we must deal with directly.

Specifically, Edgar's reliance on *Shepherd* raises an important question not addressed in *Cehrs* and still unresolved in this circuit—namely, does the point in time when the company learns that its employee cannot return to work by the end of the 12-week period of statutory leave affect the lawfulness of its termination decision? Stated another way, can evidence of an employee's medical condition acquired by the employer after the adverse employment action has been taken be used to justify that action? We believe that the answer to this question depends upon the theory of recovery invoked by the employee.

Employees invoking the entitlement theory must prove that their employer interfered with or denied them an FMLA benefit to which they were entitled. *See Arban*, 345 F.3d at 401; *Kauffman*, 426 F.3d at 885. This inquiry is an objective one divorced from the employer's motives, with the central question being simply whether the employee was entitled to the FMLA benefits at issue. These benefits are usually the 12 weeks of leave (with continued insurance coverage) and restoration to the employee's previous position or an equivalent one. *See* 29 U.S.C. §§ 2612(a)(1), 2614(a)(1). Both the DOL regulation in question and this court's decision in *Cehrs* establish that this central question must be answered in the negative when the employee is incapable of returning to work, or of performing an essential function of her position, at the end of the statutory-leave period. *See* 29 C.F.R. § 825.214(b); *Cehrs*, 155 F.3d at 784-85; *see also Throneberry*, 403 F.3d at 978 (explaining that the FMLA does not prohibit an employer from discharging an employee for legitimate reasons just because that employee happens to be on FMLA leave at the time of the discharge).

In examining the employee's ability to return to work, courts faced with a *Cehrs*-based motion for summary judgment in an entitlement case should consider all of the medical evidence bearing on the employee's ability to timely return, not just the evidence available at the time of the adverse employment action. *Cf. Bauer v. Varity Dayton-Walther Corp.*, 118 F.3d 1109, 1112 (6th Cir. 1997) (holding that a court deciding whether an FMLA plaintiff suffered from a "serious health

condition" could consider evidence of the plaintiff's medical condition that arose after his employer fired him). This principle makes sense because, rather than inquiring into the employer's motive at the time of the decision, the court is charged with resolving the objective question of whether the employee was capable of resuming his or her duties within the FMLA-leave period. Employers in entitlement cases should thus be able to invoke *Cehrs* and 29 C.F.R. § 825.214(b) (the DOL regulation) even if the medical evidence on which they rely did not emerge until after the employment decision occurred.

The same cannot be said of claims brought under the retaliation theory. What makes the employment decision unlawful under the latter theory is the motive of the employer—namely, that the action was taken *because* the employee exercised, or complained about the denial of, FMLA-protected rights. Because the *McDonnell Douglas* burden-shifting framework applies to retaliation claims, *see Skrjanc*, 272 F.3d at 315, employers will point to evidence of the employee's medical condition as a legitimate, nondiscriminatory reason for the employment decision. The time at which the evidence arises thus becomes a crucial factor in discerning the employer's motive.

In *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995), the Supreme Court reversed a decision of this court that had rejected the "after-acquired evidence rule." *Id.* at 359. That rule bars employers accused of discriminatory conduct from using evidence of an employee's wrongdoing acquired after the adverse employment action as a defense to liability under the anti-discrimination statutes. *See id.* at 360. Before *McKennon*, employers would use evidence of employee misconduct acquired after discharge as a legitimate, nondiscriminatory reason for the employment decision, thus placing on the employee the burden of proving that the proffered reason was a pretext. *See id.* at 360 ("The employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason."). The Supreme Court in *McKennon* refused to permit after-acquired evidence to bar all recovery in a case brought under the Age Discrimination and Employment Act, instead holding that such evidence did not alter the fact of the employer's liability, but rather "must be taken into account" in deciding the appropriate remedy. *Id.* at 359-61.

Another key district court case from this circuit cited by Edgar applied a modified version of *McKennon* in deciding the appropriate remedy for a prevailing FMLA plaintiff. *See Rogers v. AC Humko Corp.*, 56 F. Supp. 2d 972, 976-77 (W.D. Tenn. 1999). In *Rogers*, the plaintiff-employee was fired just days after he requested short-term disability leave due to a serious health condition affecting his legs. *Id.* at 974. After the jury returned a verdict for the employee in his retaliation suit against the company, the employer argued that damages should be limited because evidence of the employee's medical condition acquired after the discharge revealed that the employee would not have been able to resume his duties at the end of the statutory-leave period. *Id.* at 976. The district court determined that the key questions to ask in an FMLA case are as follows: (1) whether the employee was so incapacitated by a continuing serious health condition at the end of the leave period that she could not perform the essential functions of her position, and (2) whether the employer would in fact have terminated the employee for taking more leave than is permitted under the FMLA. *Id.* at 977.

Under that test, the court in *Rogers* concluded that the employer had carried its burden of proving that the employee was not capable of returning to work after 12 weeks and consequently would have been terminated even absent the improper motive. *Id.* The court also emphasized, however, that "the purposes of the FMLA would be frustrated if an employer could escape from all liability for a retaliatory discharge under [29 U.S.C.] § 2617(a)(1) simply because it has shown that the employee could not have returned to work after having taken FMLA leave." *Id.* at 977-78 (holding the employer liable, but limiting the employee's backpay award to the 12-week FMLA period because the employee would not have been able to return to work after that period). *Rogers* is thus consistent with the view that, in a retaliation case, after-acquired evidence of an employee's

inability to return to work cannot be used to shield a defendant from liability, but should be considered in determining the appropriate remedy for the FMLA violation.

This analysis does not preclude *Cehrs* and the DOL regulation from being potentially applicable in a retaliation case. To the contrary, the after-acquired-evidence rule, as its name indicates, covers only evidence discovered *after* the adverse employment action takes place. *See Bauer*, 118 F.3d at 1112 (explaining that, in cases where the employer's motive for the employment action is the primary issue, "courts should not consider evidence acquired by the employer after the decision to discharge an employee"). Employers, in other words, are still permitted to cite the medical evidence available prior to the employment decision as a legitimate, nondiscriminatory basis for taking an adverse action against an employee otherwise eligible for the 12-week leave period. Under the retaliation theory, therefore, *Cehrs* and the DOL regulation come into play at the stage where the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action.

In light of the above analysis, we believe that the following summary properly reflects the relationship among the two theories of recovery available under the FMLA, the DOL regulation, and this court's decision in *Cehrs*: (1) in entitlement cases, *Cehrs* and the DOL regulation provide a defense to liability, regardless of whether the medical evidence revealing the employee's inability to return to work is available before or after the termination decision; (2) in retaliation cases where the medical information known to the employer prior to the termination decision shows that the employee could not return within 12 weeks, *Cehrs* and the DOL regulation can be invoked by employers as a legitimate, nondiscriminatory reason for discharging the employee, i.e., to rebut the employee's prima facie case of discrimination; and (3) in retaliation cases where the employer learns of the employee's inability to return to work only after the termination decision, *Cehrs* and the DOL regulation will not provide a defense to liability, but may limit the relief to which the employee is entitled in accordance with the after-acquired-evidence rule articulated in *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995).

JAC is entitled to summary judgment under the first of the three rules described above. Edgar's claim is properly construed as invoking the entitlement theory of recovery, since she does not argue that she was terminated *because* she invoked her FMLA rights. Her complaint reads, in relevant part, that the "[d]efendant violated the FMLA by . . . (c) [u]nlawfully interfering with, restraining and denying the exercise of the attempt to exercise rights provided by the FMLA; [and] (d) [t]erminating Plaintiff in violation of the statute." Furthermore, Edgar's counsel conceded at oral argument that Edgar had not sued under a retaliation theory. For the reasons explained above, the objective inquiry required in entitlement cases does not preclude the use of evidence acquired by the employer after the termination decision. JAC fired Edgar on October 21, 2002, eight days before Dr. Day concluded that Edgar could not return to work within the statutory-leave period. Testimony from both Dr. Day and Dr. Kedzierski confirms that, just weeks after Edgar's initial absence from work, these healthcare professionals were unwilling to release her to work until long after the FMLA-leave period would have ended.

There are not, as Edgar argues, material facts in dispute regarding her mental and emotional capacity to return to work at the conclusion of the statutory-leave period. As this court explained in affirming a grant of summary judgment in another FMLA case, "[i]f, under governing law, the outcome would be the same regardless of how a factual dispute is resolved, the dispute is no bar to summary judgment." *Pharakhone v. Nissan North Am., Inc.*, 324 F.3d 405, 407 (6th Cir. 2003). Edgar points to testimony in her deposition, however, in which she expressed her willingness to return to work and her alleged ability to do so. Specifically, she stated, "I would have been able to work. I would have gone back to work."

But these statements demonstrate nothing more than Edgar's belief that she was capable of returning to work and would have been willing to do so had her doctors released her for duty. Even if the dispute as to the accuracy of these statements were resolved in her favor, Edgar still failed to produce competent evidence to rebut the uncontroverted testimony of her doctors. *See Wade v. Knoxville Util. Bd.*, 259 F.3d 452, 463 (6th Cir. 2001) (approving the district court's conclusion that the "subjective assessment" of a civil rights plaintiff as to the existence of a causal connection did not create a disputed issue of material fact). The testimony of Edgar's doctors was the only competent evidence regarding Edgar's capacity to return before the 12-week deadline. *See id.* This being the case, there are no material facts in dispute regarding Edgar's inability to meet this deadline. JAC therefore had the right to terminate her pursuant to *Cehrs* and the DOL regulation, and the district court did not err in granting summary judgment in favor of JAC on this basis.

### 2.       *The exacerbation theory*

The only remaining question is whether the "exacerbation theory" advanced by Edgar constitutes (1) an exception to the rules described above, or (2) an exception to the holding of *Cehrs* and its progeny. Neither party has directed our attention to any caselaw at the appellate level addressing the exacerbation theory, and our research has likewise revealed no such authority. The majority of the district courts that have addressed the theory, however, have rejected it as being inconsistent with the FMLA.

In *Barry v. Wing Memorial Hospital*, 142 F. Supp. 2d 161, 163 (D. Mass. 2001), for example, the plaintiff was a hospital public-relations officer who suffered from clinical depression. She was eventually hospitalized for the depression and took a leave of absence under the FMLA. While she was on her leave, the hospital sent Barry a letter indicating that, as part of a restructuring plan, her position had been eliminated and a new one, without "managerial functions or ultimate responsibility," had been created for her. *Id.* at 164. The plaintiff's condition deteriorated after she received the letter, and she was never cleared by her doctors to return to work. *Id.*

Relying on *Cehrs* and the DOL regulation, the district court granted summary judgment in favor of the hospital on the ground that Barry was unable to resume her duties by the end of the statutory-leave period. *Id.* at 165. Barry's argument that she would have been able to return to work on time had it not been for the hospital's decision to eliminate her previous position was also rejected. *Id.* at 165-66. In disposing of this argument, the court explained that the FMLA "does not address the cause of an employee's injury," but instead "entitles an employee to take a medical leave of absence and addresses an employee's rights upon return from leave." *Id.* at 166. Because Barry's continued depression eliminated her employer's obligation to reinstate her, she could not state a valid claim under the FMLA, regardless of the cause of her illness. *Id.*

Two district courts in this circuit have reached the same conclusion. *See Roberson v. Cendant Travel Servs., Inc.*, 252 F. Supp. 2d 573, 581 (M.D. Tenn. 2002); *Chrisman v. Rapid-Line, Inc.*, No. 1:04-CV-509, 2005 WL 1460291, at *4 (W.D. Mich. June 21, 2005) (unpublished). The plaintiff in *Roberson*, who suffered from epilepsy and narcolepsy, was terminated while on medical leave. *Id.* at 575. She disputed her employer's assertion that she would not have been able to return to her position by the end of a properly calculated leave period, and also argued that the firing "helped lead to [a] depression" that rendered her unable to go back to work. *Id.* at 581. Citing *Barry*, the district court rejected Roberson's contention that her employer's partial responsibility "for her failure to return to work" by the FMLA deadline altered the analysis under *Cehrs*. *Id.* The court held instead that Roberson's "FMLA claim is not strengthened by her accusations that [the employer's] letter caused or exacerbated some of her health problems." *Id.*; *see also Chrisman*, 2005 WL 1460291, at *4 (following *Roberson* and granting summary judgment in favor of the employer despite the employee's assertion that her termination and the loss of her health insurance exacerbated her depression and prevented her from returning to work).

Against the weight of this authority, Edgar points to one sentence in the district court's opinion in *Shepherd*. *See* 160 F. Supp. 2d at 873 ("Furthermore, the evidence presented revealed that the termination further aggravated Plaintiff's medical condition."). This sentence, however, did not form the exclusive basis for the *Shepherd* court's refusal to overturn the jury verdict in favor of the employee. As we explained above, the court in *Shepherd* distinguished the *Cehrs* line of cases by pointing to genuine issues of material fact that supported the jury's verdict in favor of the plaintiff, and also emphasized that the employer's evidence that the plaintiff could not have returned to work by the FMLA deadline was not acquired until after her termination. *Id.* The district court found such evidence to be relevant in the retaliatory-discharge context because the evidence shed light on the employer's knowledge—and thus on the employer's motive—at the time that it fired Shepherd. *Id.* Read in this way, *Shepherd* can be harmonized with the distinctions between entitlement claims and retaliation claims discussed in Part II.B.1. above. To the extent that *Shepherd* conflicts with our analysis discussed above, however, we decline to follow it.

We instead conclude that the exacerbation theory is not a valid theory of liability under the FMLA and does not alter the analytical framework for deciding entitlement and retaliation claims thereunder. This conclusion follows not only from the district court cases cited by JAC, but also from the language of 29 C.F.R. § 825.214(b), the DOL regulation that dovetails with the *Cehrs* line of cases. The regulation provides that an employee loses the right to reinstatement "[i]f the employee is unable to perform an essential function of the position *because of a physical or mental condition* . . . ." *Id.* (Emphasis added.)

As the italicized language indicates, the regulation focuses on whether a "physical or mental condition" prevents the employee from returning to work, not on the cause of that condition or, for that matter, whether that condition is the same one that forced the employee to take a medical leave in the first place. In sum, the FMLA—and the authoritative regulation interpreting it—is concerned not with *how* a serious physical or medical ailment occurred, but with whether that ailment precluded the employee from performing an essential function of his or her job at the end of the leave period.

Finally, policy and administrability concerns weigh against endorsing the exacerbation theory. The decisions in *Barry, Shepherd*, and *Chrisman* indicate that the exacerbation theory is especially likely to be invoked in cases where the plaintiff suffers from depression, anxiety, or a similar mental condition. Because the stress inherent in adverse employment decisions will tend to aggravate most forms of mental or emotional instability, an argument that summary judgment is precluded by factual disputes as to whether the actions of the employer worsened the employee's mental state and prevented the employee from resuming his or her position could become standard fare.

This same argument would likely apply to a number of physically infirm employees as well, since stress can adversely affect many of the common ailments from which they suffer, such as hypertension and heart disease. The exacerbation theory therefore strays from the straightforward inquiry required by *Cehrs* and the DOL regulation, which do not ask when an employee's condition arose or what caused that condition. *See Barry*, 142 F. Supp. 2d at 166 (observing that the FMLA "does not address the cause of an employee's injury"). For these reasons, the exacerbation theory is at odds with the FMLA as both this court and the Department of Labor have construed that statute. We therefore decline to adopt it in FMLA cases.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.