NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0833n.06
Filed: December 10, 2007

Case No. 06-2450

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ROBERT ROSENGARTEN, an Ohio )
resident, )
)
    Plaintiff-Appellant, ) ON APPEAL FROM THE
) UNITED STATES DISTRICT
    v. ) COURT FOR THE EASTERN
) DISTRICT OF MICHIGAN
MACSTEEL MONROE, INC., a Michigan )
corporation, )
)
    Defendant-Appellee. )
)
_____ )

BEFORE: BATCHELDER, MOORE and COLE, Circuit Judges.

    **ALICE M. BATCHELDER, Circuit Judge.** Plaintiff Robert Rosengarten appeals the district court's order granting summary judgment to Defendant MacSteel Monroe, Inc. ("MacSteel") on Rosengarten's claim that MacSteel was liable under the intentional tort exception to Michigan's Worker's Disability Compensation Act of 1969 ("WDCA"), MICH. COMP. LAWS § 418.131(1), for severe injuries Rosengarten sustained while working at MacSteel. Because Rosengarten fails to present sufficient evidence from which we can infer MacSteel's specific intent to injure Rosengarten, we AFFIRM the judgment of the district court.

## I. BACKGROUND

    MacSteel runs a steel manufacturing plant in Michigan, and, as part of its operations, bundles steel rods. The bundles of rods move slowly on large powered rollers a distance of about 15 feet to

the finishing area where the steel is weighed. Once a bundle is weighed, employees known as finishers wire a weight tag to the bundle; they then walk to the "post-heating area" where they torch the ends of the bundle. To access this area and return to the finishing area, finishers must cross a platform situated between the rollers that convey the rods. The rollers are at roughly the same level as the platform, i.e., at floor level.

Some time in 1999 or 2000, MacSteel installed a laser light curtain guard ("SICK laser" or "laser") in the finishing area. The laser is a safety device, which sends a "stop" signal to the rollers when an object or person crosses the laser's eye or beam. The laser is near the platform so that if an object or person crosses the platform between the rollers, i.e., is in the laser's scanning zone, the laser signals the rollers to stop moving so that the steel bundles do not cross the platform while someone or something is on the platform. From the date of MacSteel's plant opening in 1980 until the laser's installation in 1999 or 2000, the plant had operated without such a laser.

On or about February 25, 2005, the laser began stopping the rollers even though no objects or people were entering the laser's scanning zone. David Solosan, MacSteel's Maintenance Utility Supervisor, determined that slight movement of a mirror within the laser's scanning zone — probably caused by wind or blowing snow in the platform area — was causing the laser to stop the conveyors. Solosan programmed a "force" into the computer controlling the laser, disabling the laser until maintenance employees could reinforce the mirror and keep it from moving. The employees present at the time were made aware that the laser was disabled and two maintenance reports were circulated at MacSteel noting the problem and advising that a "force" had been applied to disable the laser until maintenance personnel resolved the problem with the mirror. Maintenance was scheduled on the SICK laser for March 1, 2005. Upon learning of the problem with the mirror and

2

laser, Jeffrey Heiden, MacSteel's rolling mill superintendent, contacted Darrel Moore, MacSteel's Maintenance Superintendent, to ensure that someone had made arrangements to repair the laser.

On March 1, 2005, maintenance personnel installed additional brackets on the mirror to prevent the laser's misreads. Both Solosan and Moore said that following the March 1 repair, they were under the impression that the problem with the mirror had been resolved and that the SICK laser was again properly functioning. None of the three supervisors (Solosan, Moore, and Heiden) inspected the laser to ensure that it was operating properly.

Rosengarten had worked for MacSteel as a billet crane operator until he began working as a finisher on March 16, 2005. Rosengarten stated that he walked across the platform between the rollers approximately 20 times his first day. On March 19, 2005, however, as he exited the post-heating area and crossed the platform, a steel bundle struck him in the right shin and crushed his right lower leg. After Rosengarten's accident, Moore determined that "the force programmed on February 25, 2005, had been accidentally left on." Later that same day, an electronics technician removed the "force," enabling the laser to operate properly.

Rosengarten stated that no one told him about the laser nor did he observe it. He did, however, assume that "there was something there to protect [him] to keep [him] from getting hit" whenever he crossed the platform. Rosengarten also said that the rollers did not move unless they were moving a bundle of steel rods. Solosan stated that he did not foresee that, as a result of forcing off the laser, an employee would be hit by a bundle as he crossed the platform between the conveyors. According to Solosan, "[f]or nearly twenty years the finishing area did not have a SICK laser installed near the platform used to cross over the conveyor into the post-heating area," and "[k]nowing that the plant operated for nearly 20 years without an operational SICK laser, I did not

3

think that I was creating a dangerous condition by forcing off the SICK laser." Neither Solosan nor Moore had any concern about forcing off the SICK laser until it could be repaired, nor did either consider that employees' crossing over the platform in the absence of a working laser was in any way dangerous. MacSteel asserted that no employee had ever before been struck by a steel bundle, and Rosengarten presented no evidence to the contrary.

Rosengarten brought suit asserting diversity jurisdiction and alleging that MacSteel's actions constituted an intentional tort, an exception to Michigan's worker's compensation scheme. Both MacSteel and Rosengarten moved for summary judgment on the issue of MacSteel's liability. Following oral argument, the district court denied Rosengarten's motion and granted summary judgment to MacSteel, finding no genuine issue of material fact regarding MacSteel's lack of actual knowledge that injury was certain to occur. Rosengarten timely appealed.

## II. ANALYSIS

We review *de novo* the district court's grant or denial of summary judgment. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 506 (6th Cir. 2006). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).[1] If, after reviewing the record as a whole, a

---

[1]The district court applied then-existing Rule 56(c) of the Federal Rules of Civil Procedure. On December 1, 2007, while this case was pending on appeal, an amended version of Rule 56(c) went into effect:

> The motion [for summary judgment] must be served at least 10 days before the day set for the hearing. An opposing party may serve opposing affidavits before the hearing day. The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

This new language contains no substantive changes to the prior version, and therefore, has no effect on the outcome of this case.

4

rational fact finder could not find for the nonmoving party, summary judgement is appropriate. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998). The fact that both parties filed summary judgment motions does not alter the standard by which we review these motions. "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

In Michigan, "[w]orker's compensation is the exclusive remedy for all on-the-job injuries, except for injuries intentionally inflicted by the employer." *Gray v. Morley*, 596 N.W.2d 922, 924 (Mich. 1999). Michigan's WDCA provides that

> The right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer for a personal injury or occupational disease. *The only exception to this exclusive remedy is an intentional tort.* An intentional tort shall exist only when an employee is injured as a result of a deliberate act of the employer and the employer specifically intended an injury. *An employer shall be deemed to have intended to injure if the employer had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge.* The issue of whether an act was an intentional tort shall be a question of law for the court. This subsection shall not enlarge or reduce rights under law.

MICH. COMP. LAWS § 418.131(1) (emphasis added). Because Michigan law requires the plaintiff to demonstrate more than negligence — even gross or criminal negligence — by the employer, "§ 131(1) requires that plaintiff present evidence that the employer specifically intended an injury, or, in lieu of such evidence, sufficient proof that the employer had *actual* knowledge that injury was *certain* to occur." *Gray*, 596 N.W.2d at 926 (emphasis in original). The alternative method, i.e., presenting evidence of actual knowledge and certainty of injury, provides a "means of inferring an employer's intent to injure from the surrounding circumstances." *Travis v. Dreis & Krump Mfg. Co.*,

5

551 N.W.2d 132, 143 (Mich. 1996). Rosengarten attempts to use this alternative method of proof, and must, therefore, demonstrate that MacSteel "[1] had actual knowledge [2] that an injury was certain to occur and [3] willfully disregarded that knowledge." MICH. COMP. LAWS § 418.131(1).

Paraphrasing the test laid out by the Michigan Supreme Court in *Travis*, the Michigan Court of Appeals explained in *Palazzola v. Karmazin Products Corp.*, 565 N.W.2d 868, 873 (Mich. Ct. App. 1997), that a plaintiff using the alternative method can prove intent by establishing three elements:

> (1) "Actual Knowledge" — This element of proof precludes liability based upon implied, imputed, or constructive knowledge. Actual knowledge for a corporate employer can be established by showing that a supervisory or managerial employee had "actual knowledge that an injury would follow from what the employer deliberately did or did not do."
>
> (2) "Injury certain to occur" — This element establishes an "extremely high standard" of proof that cannot be met by reliance on the laws of probability, the mere prior occurrence of a similar event, or conclusory statements of experts. Further, an employer's awareness that a dangerous condition exists is not enough. Instead, an employer must be aware that injury is certain to result from what the actor does.
>
> (3) "Willfully disregard" — This element requires proof that an employer's act or failure to act must be more than mere negligence, e.g., failing to protect someone from a foreseeable harm. Instead, an employer must, in fact, disregard actual knowledge that an injury is certain to occur.

Critically, "mere negligence in failing 'to act to protect a person who might foreseeably be injured from an appreciable risk of harm' does not satisfy the intentional tort exception of the [WDCA]." *Id*. at 876 (quoting *Travis*, 551 N.W.2d at 145).

We agree with the district court's determination that Rosengarten failed to establish MacSteel's *actual knowledge* of an injury certain to occur. First, Rosengarten fails to demonstrate "that a supervisory or managerial employee had actual knowledge that an injury would follow from

6

what the employer deliberately did or did not do." *Travis*, 551 N.W.2d at 143. "An employer's knowledge of general risks is insufficient to establish an intentional tort." *Herman v. City of Detroit*, 680 N.W.2d 71, 77 (Mich. Ct. App. 2004). While MacSteel deliberately disabled the laser guard, the undisputed evidence establishes that the relevant supervisory or managerial employees, i.e., Solosan, Brown, and Heiden, knew that maintenance worked on the laser on March 1, 2005, and presumed that the laser was repaired and functioning properly. At best, MacSteel was negligent in failing to ensure that the "force" had been removed and that the laser was, in fact, operating. Furthermore, even during that period when the supervisors actually knew that the laser was not operating (February 25 - March 1, 2005), none of them believed that the lack of an operating laser created a dangerous condition because the plant had operated for so many years without a laser — and without any employee ever having been struck by bundles of steel rods moving along the rollers. We echo the sentiments expressed recently in *House v. Johnson Controls, Inc.*, No. 06-1726, 2007 U.S. App. LEXIS 22583, at *10-12 (6th Cir. Sept. 19, 2007):

> [Rosengarten]'s evidence of employer knowledge, it bears adding, is far less compelling than the evidence presented in several claims summarily rejected by the Michigan courts. In *Alexander*, the plaintiff was injured while cleaning pinch rollers when there had been four prior injuries from the rollers. *See Alexander v. Demmer Corp.*, No. 230417, 2002 Mich. App. LEXIS 1223, 2002 WL 1921900, at *2 (Mich. Ct. App. Aug. 20, 2002) (per curiam). The Michigan Supreme Court summarily reversed the court of appeals and granted summary judgment for the employer. *Alexander*, 660 N.W.2d at 67. Similarly, in *Joliff v. Detroit City Dairy, Inc.*, 468 Mich. 919, 664 N.W.2d 211 (Mich. 2003), the Michigan Supreme Court summarily granted summary judgment where the employer had twice ordered the employee — over his protest — to drive a pallet jack that had no brakes, *see Joliff v. Detroit City Dairy, Inc.*, No. 232530, 2002 WL 31012627, at *1-2 (Mich. Ct. App. Sept. 6, 2002); *see also Giles*, 660 N.W.2d at 73 (summarily granting summary judgment where the employee was instructed to use a torch to splice telephone wires in a hole with a natural gas line); *Menzel v. Light Metals Corp.*, 464 Mich. 853, 627 N.W.2d 601, 601 (Mich. 2001) (summarily granting summary judgment where the employer knew that a press was double cycling and that a safety device had failed); *Gray v. Morley*, 460

7

Mich. 738, 596 N.W.2d 922, 923-25 (Mich. 1999) (holding that there could be no intentional tort even where the employer swerved violently in his truck while the employee was in the bed in order to scare the plaintiff); *Bock v. GMC*, 247 Mich. App. 705, 637 N.W.2d 825, 829-30 (Mich. Ct. App. 2001) (per curiam) (holding that GM did not have actual knowledge of certain injury from employee exposure to highly concentrated chemicals because scientific experiments establishing injuries in animals establish only a probability of injury in humans).

Second, we find that Rosengarten failed to establish that an injury was *certain* to occur. "When an injury is 'certain' to occur, no doubt exists with regard to whether it will occur. Thus, the laws of probability, which set forth the odds that something will occur, play no part in determining the certainty of injury." *Travis*, 551 N.W.2d at 143. Rosengarten simply fails to show that there could have been no doubt that this injury would, in fact, occur. Instead, the undisputed facts demonstrate that no other employee in MacSteel's history had ever been struck and injured by the steel bundles as the employee crossed the platform in the finishing area, with or without an operating laser guard in place. "[W]here [Rosengarten and other employees] had [crossed the platform countless times] without injury, he presents no evidence as to why this injury was *preordained rather than merely probable*." *House*, 2007 U.S. App. LEXIS 22583, at *12 (emphasis added). Indeed, in light of MacSteel's track record, this injury was not even probable.

Rosengarten nevertheless hangs his hat on the following language found in *Travi*s:

When an employer subjects an employee to a continuously operative dangerous condition that it knows will cause an injury, yet refrains from informing the employee about the dangerous condition so that he is unable to take steps to keep from being injured, a factfinder may conclude that the employer had knowledge that an injury is certain to occur.

*Travis*, 551 N.W.2d at 145. As the Michigan Supreme Court has clarified, however, "[a] continuously operative dangerous condition may form the basis of a claim under the intentional tort exception *only* if the employer *knows* the condition *will cause* an injury and *refrain*s from informing

8

the employee about it." *Giles v. Ameritech*, 660 N.W.2d 72, 73 (Mich. 2003) (emphasis added).

Even assuming that the absence of the laser at the platform was a continuously operative dangerous condition — a dubious assumption at best, given MacSteel's history — because the evidence simply does not support the conclusion that MacSteel knew the dangerous condition would cause an injury, we cannot even reach the question of whether MacSteel refrained from informing its employees about the danger.

As we recently noted,

> The only situation where the Michigan Supreme Court has allowed a claim to survive summary judgment since the Michigan legislature created the statutory intentional tort exception was in *Golec v. Metal Exchange Corp.*, 453 Mich. 149, 551 N.W.2d 132, 147 (Mich. 1996), the companion case to *Travis*. The court in that case found knowledge of certain harm because the employer had ordered the plaintiff to go back to placing scrap metal with combustible aerosol cans into a furnace — even after he had just been injured from a small explosion. *Id.* at 137, 147; *see also Palazzola*, 565 N.W.2d at 876 (suggesting that the employer's conduct must be "egregious").

*House*, 2007 U.S. App. LEXIS 22583, at *8. The facts here stand in stark contrast to those in *Golec*, where Golec's supervisor "ordered the plaintiff to return to work with full knowledge that the operating condition had recently resulted in an injury-causing explosion." *Marion v. Wis. Elec. Power Co.*, 159 F. App'x 710, 715 (6th Cir. 2005).

### III. CONCLUSION

Ultimately, Rosengarten is "unable to establish that [his] employer possessed the specific intent to injure [him]. Although [his] employer may have negligently permitted an unsafe work environment to exist, no intentional tort was committed. Plaintiff's sole remedy should be under the WDCA." *Travis*, 551 N.W.2d at 147; *see also Stalzer v. Shape Corp.*, 442 N.W.2d 648, 650 (Mich. Ct. App. 1989) ("claim that an injury was caused by failure to provide safe working conditions is

9

essentially a claim that the employee was injured by the employer's negligence.") (citation omitted).

Accordingly, we **AFFIRM** the judgment of the district court.