NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1152n.06

No. 11-1697

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SARA JASZCZYSZYN, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| *Plaintiff-Appellant*, | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| v. | ) | MICHIGAN |
| | ) | |
| ADVANTAGE HEALTH PHYSICIAN NETWORK, | ) | |
| | ) | O P I N I O N |
| *Defendant-Appellee*. | ) | |
| | ) | |
| | ) | |

BEFORE:     COLE and CLAY, Circuit Judges; and MATTICE, District Judge.[*]

MATTICE, District Judge.

A year-and-a-half into Plaintiff-Appellant Sara Jaszczyszyn's employment with

Defendant-Appellee Advantage Health Physician Network ("Advantage"), she began taking

intermittent FMLA leave related to worsening pain from a back injury sustained ten years before.

About five weeks into her leave, several of her coworkers saw pictures of her drinking at a local

festival on Facebook and brought the matter up with their supervisor. After reviewing the matter

internally and meeting with Jaszczyszyn, Advantage terminated her for fraud. Jaszczyszyn sued

Advantage, asserting retaliation and interference claims related to leave she purported to take

---

[*] The Honorable Harry S. Mattice, Jr., United States District Judge for the Eastern District
of Tennessee, sitting by designation.

pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA" or "the Act"). The district court granted summary judgment in favor of Advantage, which Jaszczyszyn now appeals. We AFFIRM.

I.

While the parties disagree over the inferences to be drawn from certain facts, the material facts are largely undisputed.

On January 21, 2008, Advantage offered Sara Jaszczyszyn a part-time position in its Staffing Center Float Pool. The offer was contingent upon, among other things, her being cleared to work after a health examination. During that exam, she reported that she had injured her back in a car accident in 1999 and that she had undergone surgery twice thereafter in relation to the injury. Despite her injury and follow-up surgeries, Jaszczyszyn reported that she had experienced no recent problems. On January 15, 2008, she was cleared for work without restrictions after her treating physician, Dr. Timothy Spencer, submitted a work release form to that effect.

About five months into her employment, Advantage promoted Jaszczyszyn to a full-time position in the Human Resources Department. Effective October 27, 2008, she was transferred to the Professional Billing Office to work as a Customer Service Representative ("CSR"). The CSR Position Description lists the "Physical/Mental" requirements as "minim[al]," and, as a CSR, Jaszczyszyn spent most of her day talking with customers using a wireless headset. Due to the limited range of the headset and the need for her to be able to access customers' information on her computer, she could not leave her station for an extended period of time, although she could stand as needed.

-2-

On July 29, 2009, nine months after her transfer, Jaszczyszyn called Dr. Spencer's office complaining that the back pain had been getting worse over the course of the previous six to eight months, and she requested a reevaluation. On August 31st, several images were taken of Jaszczyszyn's back; the x-rays showed the surgery site to be stable and unchanged, but the MRI and CT scan showed mild degenerative changes in the lower lumbar spine.

August 31st was also the first day Jaszczyszyn was absent from work due to her back pain. There is some conflict in the record as to whether she wanted to be off the week before Labor Day (August 31st through September 7th) to attend a family vacation, but the parties appear to agree that she had little, if any, vacation time available. The Work Release Form deeming her "completely incapacitated" from August 31st through September 7th was not completed by her doctor's office and submitted to Advantage until September 3rd. However, Jaszczyszyn said she cleared her prior absences with her supervisor, Pam Bentley.

On September 3rd, HR Representative Faith Shovein received Jaszczyszyn's Work Release Form. Shovein immediately delivered the form to the Benefits and Payroll Coordinator, Malorie Obrecht, who in turn sent the form to Dolores McLeod, a Leave Disability Specialist with Occupational Health. McLeod reviewed medical documentation to see if it supported an employee's request for FMLA leave or disability or income protection plan ("IPP") payments (i.e., certain short-term disability benefits).

Shovein informed Jaszczyszyn via voicemail that she did not have enough paid time off to cover her absences and "recommended that [she] do the [FMLA] leave to protect [her] job." Shovein followed up immediately thereafter by email with a number of documents related to Jaszczyszyn's

FMLA leave request. One of those attached documents outlined Advantage's policies and procedures with regard to FMLA leave in much more detail, including the conditions Jaszczyszyn must meet to be entitled to FMLA leave, her rights and responsibilities under the FMLA, and the steps she needed to take, both to ensure her leave was approved and while on leave. In particular, the letter stated that, after a preliminary review, Advantage had determined that she met two of the three requirements to be entitled to FMLA leave, but it needed her to provide a "Certification of Health Care Provider" ("Certification") to show that she suffered from a "serious medical condition." The letter specified that if Jaszczyszyn did not submit the Certification within fifteen days of receiving notice concerning her FMLA responsibilities, her leave could be delayed or denied. It also specified that she was required to maintain regular contact with her supervisor and, if she was on intermittent leave, to arrange an appropriate schedule and comply with the usual absence notification requirements.

The following day, Jaszczyszyn responded to Shovein's email, saying that after speaking with her doctor's office, she intended to return to work on September 8th. She also stated that her physician's paperwork would not reflect the need for an extended period of leave, but would instead cover her if she "happen[ed] to have any flare ups again." Both of the intended events occurred: Jaszczyszyn returned to work on September 8th, and on September 9th, Dr. Spencer submitted the completed Certification in accordance with Jaszczyszyn's expectations. It advised that: "Patient is having about 4 flare up's [sic] a month"; "[t]he flare up could last anywhere from a few hours or days"; and when they occurred, "[s]he may need to sit, lie down or change positions when flare up

-4-

happen [sic]." It also indicated that she would be unable to perform all her job functions, but "only when she has flare up," in which case "[s]he will need to be off . . . ."

Although the Certification reflected a need for intermittent FMLA leave—to be taken whenever she was having a flare up—Jaszczyszyn appears to have treated the leave as continuous, open-ended, and effective immediately upon Advantage's receipt of the Certification, never returning (or attempting to return) to work after September 9th.[1] Jaszczyszyn had to be reminded repeatedly that she had to give notice each day that her pain prevented her from coming to work by speaking with her supervisor personally. Those times she did give notice, however, she did so by leaving voicemails late at night or on the weekend, when no one was at work. Shovein had to follow up with Jaszczyszyn multiple times about her failure to submit the requisite paperwork in a timely fashion.

Despite Jaszczyszyn's issues with submitting the requisite paperwork and giving proper and timely notice, as of September 3rd, Advantage began treating her absences as being taken pursuant to intermittent FMLA leave, and her supervisor authorized her request for IPP benefits ("IPP form"), going back to September 10th. However, Jaszczyszyn's lack of both clarity and responsiveness caused difficulties in Advantage's internal review process. Human Resource Manager Heather Sprague indicated that Jaszczyszyn had been approved for intermittent FMLA leave and that Advantage did not seek a second opinion because there did not seem to be any question as to the legitimacy of the Certification. But, when Obrecht and McLeod reviewed the half-completed request

---

[1] The form had several sections that were incomplete or left unanswered altogether, including the question as to whether the incapacitation was continuous or intermittent, but the parts that were completed unquestionably reflect a certification for intermittent leave contingent upon ("if" and "only") a "flare up."

for IPP benefits on September 17th, McLeod noted that back pain was not, in and of itself, a diagnosis for which IPP benefits could be paid. She also expressed concern over Jaszczyszyn's continuous absence, since her Certification was only for intermittent FMLA leave and since her only Work Release Form—covering August 31st through September 7th—predated that Certification. Shovein responded that she was not sure what to do until Jaszczyszyn received a final treatment plan during her appointment with Dr. Spencer on September 22nd.

Some of the confusion as to the nature of her leave was resolved after Jaszczyszyn's September 22nd appointment with Dr. Spencer. After conducting an examination and reviewing the images of her back, he assessed her as having "[r]ecurrence of severe lumbago with lower extremity radiculopathy." Perhaps more importantly, he completed the Health Care Provider Certification section of the IPP form. While he did not answer the question as to whether Jaszczyszyn was able to perform her regular job duties, he did answer a follow-up question, indicating a "projected length of disability" from September 10th through October 5th. Dr. Spencer's predictive abilities were apparently limited, though; just eight days later, on September 30th, he (or his office) completed and signed a second Work Release Form for Jaszczyszyn indicating that she was completely incapacitated for another three weeks, from October 5th through the 26th.

Three days later, on October 3rd, Jaszczyszyn attended Pulaski Days, a local Polish heritage festival. Over a period of at least eight hours, she visited three Polish Halls with a group of her friends. One friend shared approximately 127 pictures from that day with Jaszczyszyn, who posted, on her Facebook page, 9 pictures featuring herself.

At some point during that weekend, she left Bentley multiple voicemails indicating that she was in pain, would not be attending work on Monday, and would contact Shovein to inform her of the same. After Bentley heard the messages on Monday morning, she informed Shovein that she had been having trouble getting Jaszczyszyn to communicate with her, and she attempted to see if there was any update on Jaszczyszyn's status. This lack of communicativeness would not be Bentley's primary concern for long.

Because Jaszczyszyn was "friends" with several of her coworkers—including Bentley—on Facebook, the pictures were visible to them. One of those coworkers, upset about the behavior she believed was pictured therein,[2] brought the photographs to Bentley's attention. Bentley noted that "[o]ther staff members on the floor that were also friends with Sara felt a little betrayed or duped by Sara because they were trying to cover for her only to see her out on Facebook partying." Since she felt that, as a supervisor, she needed to address the concerns brought to her, she looked at the photographs in question when she arrived home that evening. Bentley sent her supervisor, Professional Billing Department Director Lori Whilden, a message about the photos, and the morning of October 6th, Whilden met with Sprague to discuss the situation. Sprague called Bentley into the meeting and asked her to forward a couple of the pictures, which Bentley did when she got home that evening, choosing a few that she felt best represented what upset the other employees. The next day, Sprague contacted Advantage's designated attorney; developed an investigation plan; and

---

[2] The precise nature of the behavior pictured in the photographs—e.g., whether Jaszczyszyn was dancing or merely standing between two friends, one of whom grabbed her arm and raised it—is the subject of substantial, but ultimately immaterial, debate.

met with Shovein, Bentley, and Whilden to discuss potential outcomes. Sprague then met with her direct supervisor and outlined the steps she had taken and was planning to take.

While Jaszczyszyn had been absent on FMLA leave informally for weeks, Shovein emailed her a copy of the formal approval letter on October 7th. In that e-mail, Shovein reminded Jaszczyszyn that her extension had yet to be approved, advised her that she should keep in contact with her manager, and asked Jaszczyszyn to contact her as soon as possible. When Jaszczyszyn had not responded by that evening, Shovein left Jaszczyszyn a voicemail asking her to come to work the next morning to discuss issues related to her leave. In neither her email nor the voicemail message did Shovein mention the issue with the Facebook pictures.

Shovein and Sprague met on the morning of October 8th to prepare a Corrective Action Notice (i.e., a notice of termination with a statement of the problem) to give to Jaszczyszyn at a meeting later that day. It was standard practice both to prepare those forms in advance—so that a copy would be at hand if the decision was made to proceed with the discipline—and to discard those draft forms if they were rendered unnecessary. Shovein and Sprague then went to the meeting with Jaszczyszyn to discuss the issues surrounding her leave; the details of that meeting are reflected in a "Record of Conversation," which Shovein prepared directly after the meeting.

During the meeting, they first discussed Jaszczyszyn's communication issues, including her request for an extension of her FMLA leave through October 26th without discussing it with Bentley. They next discussed her job requirements and the injuries that she argued prevented her from fulfilling those requirements, before asking her if she knew how seriously Advantage took fraud. Jaszczyszyn made clear she knew they took it very seriously. Sprague and Shovein then spent most

of the meeting discussing the pictures of Jaszczyszyn at the festival, which they believed were inconsistent with the statements she had made in support of her requests for FMLA leave and with the two Work Releases, which stated that she was "completely incapacitated."

Jaszczyszyn did not agree with their characterization of the pictures, but she did not voice that disagreement at the meeting. She defended attending the festival by arguing that no one had told her it was prohibited. When asked to explain the discrepancy between her claim of complete incapacitation and her activity in the photos, she did not have a response and was often silent, occasionally saying that she was in pain at the festival and just was not showing it. When Sprague asked why she did not come to work for any time at all during those weeks, she said she did not know part-time work was an option.

Sprague said that, had Jaszczyszyn offered a reasonable explanation of the discrepancy between her claims and the photos, she would have considered suspending Jaszczyszyn pending an investigation of that explanation. But Jaszczyszyn repeatedly failed to respond at all, let alone offer such a justification, and it became apparent that suspension was not an option. At the conclusion of the meeting, Sprague presented Jaszczyszyn with the Corrective Action Notice—which Sprague, Shovein, and Jaszczyszyn signed—and terminated her.

Two weeks later, on October 20th, Bentley prepared a Termination Report, on which she selected "absenteeism/lateness"—from six choices altogether, including "incompetence," "changing job," "reduction in force," "family," or "other"—as the reason for Jaszczyszyn's separation. Jaszczyszyn argued that this was proof of an inconsistent justification for her termination. She claimed that if FMLA fraud was truly the motivating factor behind her termination, Bentley would

-9-

have selected "other" and written in a justification relating to "fraud." Bentley stated that, in selecting "absenteeism," she was merely trying to work within the framework provided and that she believed "absenteeism" adequately described the issues leading to Jaszczyszyn's termination.[3]

On February 17, 2010, Jaszczyszyn initiated the present action in the Western District of Michigan, alleging that she was terminated in retaliation for exercising her rights pursuant to the FMLA or to interfere with her exercise of those rights and asserting just two claims: an FMLA interference claim and an FMLA retaliation claim. On December 8, 2010, Advantage moved for summary judgment, arguing that there was no evidence showing that anyone at Advantage had a retaliatory motive and that it had an "honest suspicion" Jaszczyszyn was abusing her leave. The district court heard oral argument on the motion on April 25, 2011 before ultimately granting summary judgment to Advantage on May 6, 2011. Jaszczyszyn timely filed a notice of appeal to this Court on May 31, 2011.

## II.

We review the district court's grant of summary judgment *de novo*. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 281 (6th Cir. 2012). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that no genuine issue of material fact exists, which it may discharge either by

---

[3] Jaszczyszyn appears to have made a full recovery very shortly after she was terminated. She did not see Dr. Spencer again after her termination, and since November 2009 (just one month later), she has not suffered any health problems and has been fully able to work. In June 2010, she found employment with a similar employer, but was terminated on September 21, 2010 due to "excessive absenteeism" during the orientation period.

-10-

producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *see* Fed. R. Civ. P. 56. A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Moldowan*, 578 F.3d at 374. In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

III.

The Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA" or "the Act") creates, in eligible employees, an entitlement to a total of 12 workweeks of leave during any 12-month period for certain events, including "a serious health condition that makes the employee unable to perform the functions" of his or her position. 29 U.S.C. § 2612(a)(1)(D). There are two distinct theories of recovery under the FMLA: the "interference" or "entitlement" theory, grounded in § 2615(a)(1), and the "retaliation" or "discrimination" theory, grounded in § 2615(a)(2). *Seeger*, 681 F.3d at 282.

For an interference claim, a plaintiff must establish that: "(1) [s]he was an eligible employee, (2) defendant was a covered employer, (3) [s]he was entitled to leave under the FMLA, (4) [s]he gave defendant notice of [her] intent to take leave, and (5) the defendant denied [her] FMLA benefits or interfered with FMLA rights to which [s]he was entitled." *Harris v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 594 F.3d 476, 482 (6th Cir. 2010). For a retaliation claim, a plaintiff must establish that: "(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action." *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (citing *Arban v. West Pub. Co.*, 345 F.3d 390, 404 (6th Cir. 2003)). Only the last prongs of each of the tests are contested here.

As this Court noted very recently, while a claim for FMLA-related discharge can sound in either theory, "the requisite proofs differ," particularly as to the question of the employer's intent. *Seeger*, 681 F.3d at 282. Under the interference theory, "[b]ecause the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006) (quoting *Arban*, 345 F.3d at 401) (internal quotation marks omitted). In contrast, under the retaliation theory "the employer's motive is an integral part of the analysis," *because* "retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Id*. at 508 (emphasis and internal citations omitted). Though, as the court noted in *Edgar*, the interference theory does not convert the FMLA into a strict-liability statute because

"interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Id.* at 507–08.

This "legitimate, unrelated reason" carve-out or exception has caused some confusion as to the role of the employer's intent in FMLA interference claims. And this confusion becomes particularly problematic in cases, like this one, where the employee was terminated while on leave and where the employee's claims sound in both interference and retaliation. For instance, two of the issues presented to us on appeal are (1) whether the burden-shifting analysis of *McDonnell Douglas v. Green*, 411 U.S. 792 (1978) applies in a FMLA interference claim, and (2) whether the "honest belief" rule articulated in *Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998), applies in an FMLA interference claim.

The first question was answered recently in *Donald v. Sybra, Inc.*, 667 F.3d 757 (6th Cir. 2012). In that case, the Court noted that, while "[t]here is no doubt that this Court applies the *McDonnell Douglas* burden-shifting framework to FMLA retaliation suits when the plaintiff produces indirect evidence of a causal connection between the protected activity and the adverse employment action," that framework's status vis-à-vis retaliation claims was less clear. *Id.* at 762 (citing *Edgar*, 443 F.3d at 508). After discussing at length the lack of clarity on the issue and noting the problems inherent in "[a]pplying rules designed for anti-discrimination laws to statutes creating substantive entitlements," the Court found that the *McDonnell Douglas* regime applied to FMLA interference claims. *Id.* (quoting *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 712 (7th Cir. 1997)). The Court construed the previously-published decision in *Grace v. USCAR*, 521 F.3d 655,

-13-

670 (6th Cir. 2008), as "effectively adopt[ing] the *McDonnell Douglas* tripartite test without saying as much," and thus "requir[ing] the conclusion" that *McDonnell Douglas* is "correctly applied . . . to both . . . interference and retaliation claims." *Id.* at 762.[4]  It is important to note that both *Donald* and *Grace* consider only FMLA interference claims where the employer has offered a "legitimate reason unrelated to the exercise of FMLA rights for terminating the employee." *Donald*, 667 F.3d at 762; *Grace*, 521 F.3d at 670 ("If the defendant proffers such a justification, then the plaintiff may seek to rebut it by a preponderance of the evidence.") (emphasis added). Therefore, their holdings may not extend to cases where such a rationale is not offered, in which the McDonnell Douglas burden-shifting regime would likely be less useful.

The second question—whether the "honest belief" rule articulated in *Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998), applies in an FMLA interference claim—was implicated by *Donald*, but not addressed squarely.  The "honest belief" rule provides that, "so long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Id.* at 806.

---

[4] *Grace* may be read as a case in which the Court merely found the factors outlined in *McDonnell Douglas* and its progeny *useful* in considering whether the employer's proffered reason for termination was legitimate without meaning to import the full burden-shifting regime of *McDonnell Douglas*, along with its attendant caselaw and history, particularly as it did not do so directly, let alone explicitly. While that reading seems to be more in keeping with how this Court treated FMLA interference and retaliation claims in *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826 (6th Cir. 2012) (explicitly applying *McDonnell Douglas* to racial and FMLA discrimination claims but not doing so to the plaintiff's FMLA interference claims, which the court discussed between the two other claims), such a reading is now foreclosed by *Donald*.

After deciding in *Donald* that the *McDonnell Douglas* test applied to both the FMLA retaliation and interference claims, the Court "turn[ed] to the substance of Donald's FMLA claims," the last piece of evidence relevant to which was "the accusation of theft" Donald's employer made against her. In discussing that accusation, the *Donald* court stated:

> [Donald] vociferously denies the allegation, and argues that there are reasons as to why orders may have irregularities and why her drawer may have been short. This is irrelevant. We have adopted the honest belief rule, reasoning that it is not in the interests of justice for us to wade into an employer's decisionmaking process. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir. 2007). It is instead the employer's belief, and whether it is informed and nondiscriminatory, with which we are concerned. We do not require that the employer arrived at its decision in an "optimal" matter, *id.* at 599, but that it "reasonably relied on the particularized facts that were before it at the time the decision was made." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (internal quotation marks omitted).

*Donald*, 667 F.3d at 763.

The *Donald* opinion did not make clear which FMLA claim the Court was analyzing at that stage. Both of the cases the opinion cited in discussing the honest belief rule were discrimination cases—race and age discrimination, respectively—and it even noted that part of the test is whether the employer's belief is "informed and nondiscriminatory." *Id.* On one hand, the fact that it had just discussed interference claims and appears to have collapsed the analysis of the interference and retaliation claims militates in favor of reading *Donald* as adopting the honest belief test in FMLA interference claims. On the other hand, the fact that it cites only discrimination cases and discusses "discriminatory intent" militates in favor of reading *Donald* as discussing the "honest belief" rule only within the context of the retaliation claim. Because that opinion does not address the issue

-15-

clearly, let alone explicitly, it is not appropriate to read it as either adopting or rejecting the "honest belief" rule within the context of FMLA interference claims.[5]

The more appropriate way forward in this case is that provided in the later-published *Seeger* opinion. In that case, the Court noted that the plaintiff purported to advance both interference and retaliation claims but "received all of the FMLA leave to which he was entitled" and thus "the district court did not err in confining its analysis of Seeger's FMLA claim to the retaliation theory." *Seeger*, 681 F.3d at 283. In this case, while Jaszczyszyn could have argued that Advantage terminated her in connection with her second request for FMLA leave, she instead argued that the basis for her interference claim was only the failure of her employer to reinstate her.

Advantage had approved Jaszczyszyn's first request for leave—and paid her for all the time taken off—but had not yet ruled on her second request for FMLA leave (for October 5th through the 26th). Further, the investigation into the employee complaints about her behavior at the festival did not begin until the afternoon of Monday, October 5th, after her supervisor had already discussed her ongoing leave with an HR representative. It is clear—and Jaszczyszyn provided no evidence to the contrary—that the reason she was not at work after her first period of FMLA leave was not that Advantage had denied her reinstatement. Rather, Jaszczyszyn had submitted a second request for leave that Advantage appeared to be treating the same as her first. That is, before the appropriate paperwork had been completed, it allowed her to take the time off, treated it as being taken pursuant to FMLA and paid her for that time. Therefore, as in *Seeger*, it appears that Jaszczyszyn had been

---

[5] The "honest belief" rule is inextricably linked with questions of discriminatory intent, and, as the *Donald* court noted, bringing that rule into the interference realm would further erode the boundaries between the interference and retaliation claims.

-16-

given all the leave to which she was entitled, and her interference claim fails, leaving just her retaliation claim.

Jaszczyszyn's retaliation claim also fails. The last element she is required to show is that there was a causal connection between the protected FMLA activity and the adverse employment action. *See Killian*, 454 F.3d at 556. Yet she introduces little or no evidence on this point. She states that she does not have to go through the *McDonnell Douglas* analysis because of the termination notice signed by Bentley, which she believes is direct evidence of unlawful motive as it lists "absenteeism" instead of "fraud" as the reason for her termination. Not only was that termination report completed by an individual not responsible for the decision to terminate her, but, as the district court accurately noted, it was "not incorrect." In fact, despite Jaszczyszyn's assertion, "absenteeism" was an accurate characterization of her behavior. Advantage's decision not to select "other" and write in a more specific reason is consistent with the stated reason for her termination. Likewise, while she relies heavily on the fact that the Corrective Action Notice was prepared in advance as evidence of pretext, at no point does she provide any evidence to counter Advantage's assertion that this was standard practice. Throughout her briefs before the district court and on appeal, she repeatedly argued that a jury would not be required to believe Advantage's witnesses or evidence. However, she fails to offer any evidence "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(B).

As in *Seeger*, Advantage "rightfully considered workplace [FMLA] fraud to be a serious issue," and its termination of Jaszczyszyn because of her alleged dishonesty constituted a non-retaliatory basis for her discharge. *See Seeger*, 681 F.3d at 284. While Jaszczyszyn relies heavily

-17-

upon a significant amount of after-the-fact medical evidence (such as the deposition of her treating physician) in trying to cast Advantage's justification as pretextual, Advantage's investigation was adequate and turned in large part on Jaszczyszyn's own behavior at the termination interview, which she does not address at all. She did not refute Advantage's honest belief that her behavior in the photos was inconsistent with her claims of total disability. Thus, as a result of her fraudulent behavior, her claim of FMLA retaliation fails. We therefore conclude that the district court did not err in granting summary judgment to Advantage.

IV.

For the foregoing reasons, the judgment of the district court is AFFIRMED.