NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0688n.06

No. 15-3292

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JOSEPH CASAGRANDE,

    Plaintiff-Appellant,

v.

OHIOHEALTH CORPORATION and AMY SAYERS,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Dec 20, 2016
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

BEFORE:    DAUGHTREY, ROGERS, and WHITE, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. After Joseph Casagrande took a leave of absence for a medical condition, he sought to return to his job as a registered nurse at OhioHealth's Riverside Methodist Hospital. He encountered multiple delays in returning to work, however, and although he was eventually allowed to return, his reinstatement did not last long. Some six months later, OhioHealth terminated his employment. Casagrande filed suit, alleging, first, that OhioHealth interfered with his right under the Family Health and Medical Leave Act (FMLA) to return to work immediately after receiving medical clearance and, second, that OhioHealth—through Casagrande's supervisor, Amy Sayers—retaliated against him for taking FMLA leave in the first place. The district court granted summary judgment to the defendants on both claims, and Casagrande now appeals that decision. Because there are

genuine disputes of fact concerning his claims, we must reverse the district court's judgment and remand this case for trial.

## FACTUAL AND PROCEDURAL BACKGROUND

Casagrande began his employment with OhioHealth on December 5, 2011, working as an registered nurse on Riverside Hospital's 7 Orange unit, which was a high acuity unit that included sicker patients, many of whom had multiple diagnoses. The position on 7 Orange was Casagrande's first job out of nursing school, after working as an accountant and chief financial officer for some 25 years. Casagrande was under the supervision of Sayers, but they did not actually work together because their shifts did not overlap.

Because Casagrande was new, he had to go through an orientation period overseen by more experienced nurses. The training nurses reported that none of Casagrande's "core clinical skills" was a "performance concern," but they did note that he struggled with time management and organization, common problems for new nurses. As a result, Casagrande was required to complete an extra week of orientation to shore up his weaknesses.

In February 2012, Casagrande began caring for patients on his own. Approximately a month later, he received his first disciplinary measure: a "verbal coaching" regarding patient-restraint documentation. From March to July 2012, there were no reported issues with Casagrande's performance. In July, Casagrande experienced neck pain so severe that he was required to miss work. The medication he took for pain raised his blood pressure, resulting in a visit to the emergency room. Casagrande also suffered from periodic anxiety and panic attacks, stemming from the stress of his new career.

When Casagrande informed Sayers of his health issues, she told him to keep track of his absences and either to take medical leave or to contact the employee assistance program.

Casagrande filled out a form requesting a continuous leave of absence from July 20 through August 7. OhioHealth granted Casagrande medical leave and temporary disability pay equal to 70 percent of his salary, but the leave was under OhioHealth's internal leave policy. OhioHealth made it clear to Casagrande that he was not eligible for FMLA leave because he had not been employed there for the necessary minimum of twelve months. Casagrande returned to work at the end of his medical-leave period.

On October 10, 2012, Casagrande received a second disciplinary measure, a notation in his record that he had eight unscheduled absences and a warning that the next occurrence would result in "further disciplinary action leading up to and including termination." Sayers and Casagrande met that day and discussed his personal issues and whether he should consider transferring to a less demanding work environment. Another disciplinary entry in his record followed two weeks later for incomplete documentation and other performance issues. Accompanying the second entry was a note from Sayers that read, "I spoke [to Casagrande] today about owning the process of finding another position inside or outside of OhioHealth where he can be successful." Sayers later testified that during this time she saw "a trend of performance concerns and issues" and that she felt that Casagrande was "not going to make it on the unit."

The added stress from these performance issues took a toll: Casagrande began consuming alcohol with sleep medicine in order to get a decent night's rest and, on one occasion after he had missed two shifts at work, he was found non-responsive and was taken to the emergency room. This incident resulted in Casagrande's second medical leave of absence, which was originally set for November 2 through November 22, 2012. OhioHealth again made it clear that Casagrande was not eligible for FMLA leave because he had still not worked for the required twelve months'

minimum. This leave of absence was later extended twice: first through March 1, 2013, and then through April 20, 2013.

Despite Casagrande's leave status, Sayers sent him a letter on November 8, 2012, informing him that OhioHealth was posting his job on that day. Sayers later notified Casagrande that the position had been filled effective December 11, 2012. Meanwhile, Casagrande took his employer's information at face value and assumed that he was ineligible for FMLA leave. However, on December 5, 2012, he passed the one-year mark as an employee of OhioHealth and, apparently unknown to all involved, met the FMLA's threshold requirement for coverage.

In January 2013, Casagrande was ready to go back to work. He contacted his case manager in the hospital's health office, Rose Cacioppo, who told him that he needed a return-to-work release. Casagrande was concerned that such a release would end his temporary OhioHealth disability pay, which was slated to run through February 12, 2013, before he was able to find a new position. In response to this concern, Cacioppo told him to pursue potential positions and to obtain a return-to-work release only after he had an offer in hand. Cacioppo also set up a January 18 meeting with Casagrande and members of the HR department to explore positions that would be a good fit for him.

Around the time when Casagrande's employer-sponsored disability pay was scheduled to end, he started checking into the FMLA to determine his eligibility. His investigation included a phone call to the Department of Labor to confirm that he became eligible for FMLA protections on December 5, 2012—the one-year mark of his employment—even though he was on leave at that time. He passed this information along to hospital employees on multiple occasions, but OhioHealth reiterated its understanding that Casagrande was not eligible for FMLA protections because he was not working when he reached the one-year-of-employment mark. Acting on the

advice of officials at the Department of Labor, Casagrande provided a return-to-work release from his doctor on February 23, some two weeks after his disability pay ended.

OhioHealth finally took upon itself an investigation of Casagrande's FMLA eligibility. After looking into the matter, OhioHealth determined that its original position was mistaken and, indeed, that Casagrande had become eligible for FMLA leave beginning on December 5, 2012. On March 12, 2013, Cacioppo called Casagrande to let him know that OhioHealth was restoring him to his prior position on 7 Orange, as the FMLA required. Casagrande filed this lawsuit two days later and then went back to work on March 18, 2013.

On Casagrande's first day back, an OhioHealth official informed him that his previous disciplinary notations from October 2012 were still in effect. Although Casagrande then sought to appeal them, the time for doing so had expired. Meanwhile, Sayers was still skeptical of Casagrande's ability to make it on 7 Orange, but she said that she was willing to give him a second chance. Casagrande went through another short orientation program before caring for patients on his own.

Nevertheless, allegations of deficiencies in Casagrande's performance began to mount up. On April 18, he received a verbal reprimand for possibly leaving a patient-medication box unlocked, although it is unclear whether Casagrande's supervisors were certain that he was responsible for this incident. On April 21, he received a verbal reprimand after an "anonymous unusual-occurrence report" was filed, alleging that he failed to pass out morning medications to his patients. Under hospital policy, however, these reprimands were not considered to be "disciplinary." On April 23, another anonymous report alleged that one of Casagrande's patients was missing an identification band at the end of Casagrande's shift—violating a "red rule" policy, or a rule instituted for patient safety, which could result in immediate termination.

After the last violation, Sayers drafted a final warning for Casagrande, but this warning was not delivered, possibly because Casagrande sent an email to Sayers that offered an explanation for the three April incidents. Regarding the "red rule" violation, Casagrande indicated that the patient's armband disappeared twice during the night of April 23. He had replaced it once and intended to do so again after discovering that it was missing a second time, but the nurse taking over for him replaced it before he had a chance. By this time, Casagrande had come to believe that "he was being set up," and he indicated in the email that he might add a retaliation claim to his lawsuit if OhioHealth took an adverse employment action against him.

When Sayers conducted Casagrande's annual evaluation on April 30, 2013, she remained skeptical about his ability to continue work on 7 Orange. Casagrande nevertheless maintained his position on the unit, despite receiving reprimands in May, June, and July. In early September, he received a write-up for four patient-safety issues that occurred between August 30 and September 9. As a result, OhioHealth placed Casagrande on a "fact-gathering suspension" on September 12, citing "multiple medication administration safety events and the lack of meeting the unit and organization's expectations . . . in the delivery of excellent and safe patient care." A month later, OhioHealth fired Casagrande, after determining that two of the four issues from September had merit, and an internal review board upheld the termination on appeal.

As promised in the email he sent in response to the April reprimands, Casagrande added a retaliation claim to his then-existing lawsuit based on the FMLA. He named both OhioHealth and Amy Sayers as defendants in the amended complaint. The parties filed cross-motions for summary judgment. The district court awarded summary judgment to the defendants on both claims. On the interference claim, the court granted the defendants' motion on three bases. First, the district court determined that Casagrande could not argue that his communication about

returning to work in January left his FMLA eligibility unaffected while also arguing that the communication triggered OhioHealth's duty to reinstate him. Second, the district court ruled that because Casagrande did not provide a return-to-work release in January, the delay in his reinstatement did not amount to interference under the FMLA. And, third, the district court said that because OhioHealth offered Casagrande back-pay for the 20-day delay in reinstatement after he provided his return-to-work release, he had suffered no harm. On the retaliation claim, although the court held that Casagrande made out a *prima facie* case, it held that no reasonable juror could conclude that OhioHealth's legitimate reasons for termination, *i.e.*, Casagrande's performance deficiencies, were pretextual because Casagrande provided no direct evidence of what the actual reason for termination was.

## DISCUSSION

Under the FMLA, an eligible employee is entitled to 12 weeks of leave each year "[b]ecause of a serious health condition that makes the employee unable to perform the functions of [his] position." 29 U.S.C. § 2612(a)(1)(D). An eligible employee is one who has been employed by the entity from whom the leave is requested for at least 12 months and who has worked for at least 1250 hours for that employer during the previous 12 months. 29 U.S.C. § 2611(2)(A). An employer need not pay an employee who is on FMLA leave, but the employer may choose to provide paid leave for all or part of the employee's absence. 29 U.S.C. § 2612(c)–(d). Upon returning from medical leave, employees are entitled to be restored to the same position that they held when their leave commenced, or to an equivalent position. 29 U.S.C. § 2614(a)(1). An employer may "have a uniformly applied practice or policy" that requires employees who take FMLA leave to receive certification from their health care provider before returning to work. 29 U.S.C. § 2614(a)(4).

It is unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA, or "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a). This provision of the FMLA gives rise to two theories of liability. Under the first, an employer violates the FMLA under the "interference" theory if it fails to provide its employee with his FMLA entitlements or interferes with an FMLA-created right, regardless of the employer's intent. *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). An employer also violates the FMLA under the "retaliation" theory if it takes adverse action against an employee because the employee invokes an FMLA right, rather than for a legitimate, nondiscriminatory reason. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012). Casagrande brings claims under both theories.

The district court granted the defendants' motion for summary judgment on both claims and denied the plaintiff's motion for partial summary judgment on his interference claim. We review the district court's grant of summary judgment and resolution of legal questions *de novo* and accept the district court's factual findings as true unless they are clearly erroneous. *TransAmerica Assurance Corp. v. Settlement Capital Corp.*, 489 F.3d 256, 259 (6th Cir. 2007).

## Casagrande's Interference Claim

To prevail on an interference claim, an employee must prove that: (1) he was an FMLA-eligible employee, (2) the defendant was an "employer" as defined under the FMLA, (3) he was entitled to FMLA leave, (4) he gave the employer notice of his intention to take leave, and (5) the employer denied the employee FMLA benefits to which he was entitled. *Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014) (citing *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)). Because the FMLA is not a strict-liability statute, the employee also must

show that the employer's violation caused him harm. *Edgar*, 443 F.3d at 507-08. This appeal

concerns only whether Casagrande was improperly denied FMLA benefits and whether he was

harmed.

**Right to Restoration in January 2013**

Casagrande contends that OhioHealth denied him FMLA benefits when, after he

provided unambiguous notice at the January 18 meeting that he was prepared to return to work,

he was not restored to his prior position until March 18. OhioHealth responds that Casagrande

was not entitled to job restoration in January because he did not provide a medical certification

clearing him to return to work until February 27, 2013.[1]  Casagrande acknowledges that, under

the FMLA, an employer may apply a uniform policy or practice of requiring medical

certification from a healthcare provider before an employee returns to work. He insists,

however, that OhioHealth did not have such a policy or, if it did, that the policy was not properly

applied to him.

Under the FMLA statute and regulations, an employer may have a uniformly applied

policy for similarly situated employees requiring them to provide medical certification that they

are able to return to work before returning from FMLA leave taken for a serious health

condition.[2]  29 U.S.C. § 2614(a)(4); 29 C.F.R. §§ 825.312(a), (d) & (e), 825.313(d). "The

employer is responsible in all circumstances for designating leave as FMLA-qualifying, and for

giving notice of the designation to the employee," and if a fitness-for-duty certification is

---

[1] OhioHealth contends that Casagrande has raised his argument that OhioHealth violated the FMLA by providing inadequate notice for the first time on appeal. However, Casagrande does not appear to raise inadequate notice as an independent FMLA violation claim but, rather, to counter OhioHealth's argument that he failed to provide the medical certification that would trigger his right to reinstatement in January. He posits that OhioHealth "cannot avoid liability by arguing that Casagrande failed to comply with the regulations when [OhioHealth] failed first to properly notify Casagrande of the requirements and consequences it seeks to enforce." We conclude that OhioHealth's attempt to cast the notice issue as a new claim is unpersuasive.

[2] The FMLA regulations use the term "fitness-for-duty certification," 29 C.F.R. § 825.312, and OhioHealth uses "return-to-work release." These terms appear to be interchangeable and are treated as such in this opinion.

required for the employee's job to be restored, the designation notice must so state. 29 C.F.R. § 825.300(d)(1) & (3). Because it is undisputed that Casagrande did not provide a fitness-for-duty certification from his doctor until February 27, the issue becomes whether OhioHealth had a uniform policy or practice of requiring medical certification before employees returned to work and, if so, whether it adequately informed Casagrande of this policy.

Our review of the record has failed to disclose whether or not OhioHealth had a uniform policy of requiring medical certification before allowing employees to return to work. Without analyzing the issue, the district court appeared to assume that OhioHealth had such a policy and held that Casagrande was not eligible for reinstatement in January, even though he had informed OhioHealth that he was ready to return to work, because he had not provided a return-to-work note from his doctor. But, the district court also observed, "Certainly, reasonable jurors could reach conflicting conclusions with regard to whether Plaintiff suffered FMLA interference when he was not reinstated to his position in January 2013."

This determination by the district court evinces a genuine dispute of fact that should have prevented the grant of summary judgment on the interference claim. The court's conclusion undoubtedly stems from evidence of notice to Casagrande in two November 2012 letters that following his paid medical leave, he would need to "provide the proper return to work documentation," including a "release . . . from your doctor." But, OhioHealth's policy statements in the letters were contradicted by its actions. In August 2012, Casagrande had been permitted to return to work after his medical leave without providing a fitness-for-duty certification, which could be taken by a fact-finder to indicate the lack of a uniform policy. Indeed, OhioHealth had also discouraged Casagrande from providing a return-to-work release during his second period of leave until he had secured a new job, even though Casagrande

reported that he was ready to return to work. In sum, there is a genuine dispute of material fact as to whether OhioHealth had a policy of requiring return-to-work releases before employees could return to work. If we assume, *arguendo*, that the company had such a policy, there is nevertheless a genuine dispute as to whether Casagrande was adequately informed of it.

There is no dispute, however, that OhioHealth did not advise Casagrande that his failure to provide medical certification would result in denial of job restoration. As a result, we find that OhioHealth interfered with Casagrande's FMLA rights as a matter of law, because even if OhioHealth had a policy of requiring fitness-for-duty certification, and even if OhioHealth notified Casagrande of this policy, it is undisputed that OhioHealth did not inform Casagrande of the consequences of failing to provide a certification. *See Wallace*, 764 F.3d at 587–88 (holding reasonable a jury's finding that an employer failed to inform an employee of the consequences of not providing medical certification and that the employer thereby interfered with the employee's FMLA rights when it terminated her for not producing a certification form). It is irrelevant that OhioHealth failed to provide the required notification based on its mistaken belief that Casagrande's leave was not covered by the FMLA and thus did not know that he was entitled to job restoration. OhioHealth had the duty to make a correct FMLA-eligibility determination and notify Casagrande of his eligibility, of the requirements that flowed therefrom, and of the consequences of failing to adhere to them, 29 C.F.R. §§ 825.300(d) & 825.301(a), (e); *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 87 (2002). Thus, OhioHealth must bear the consequences of its mistaken belief that Casagrande was not FMLA-eligible. Although OhioHealth does not appear to have acted in bad faith, the employer's intent is irrelevant to an FMLA interference claim. *Arban*, 345 F.3d at 401.

Having found that OhioHealth interfered with Casagrande's FMLA rights, we further conclude that he was harmed by the interference, although the extent of the harm involves yet another dispute of fact. Because Casagrande was not notified properly of OhioHealth's medical-certification policy and the consequences of non-compliance, he was not required to submit a return-to-work release and was entitled to job restoration in January 2013 when he told OhioHealth he was ready to return to work. Thus, there is no question that Casagrande was harmed by the defendants' failure to restore him to his job until March 18. Even if the check for back-pay that OhioHealth offered Casagrande alleviated that harm, an issue discussed below, the check purported to cover only the period from February 27 through March 18.

**Right to Restoration After February 27, 2013**

Casagrande submitted a return-to-work release from his doctor on February 27, 2013, and was restored to his job on March 18. Casagrande asserts, with support from the case law, that OhioHealth was required to restore him to his previous position or its equivalent within two business days of receiving unambiguous notice of his desire to return to work, citing *Hoge v. Honda of America Manufacturing, Inc.*, 384 F.3d 238, 250–51 (6th Cir. 2004). OhioHealth dodges the issue of when it should have restored Casagrande to his position, arguing that Casagrande was not harmed by any delay because OhioHealth sent him a check for back wages. Casagrande responds that he was, in fact, harmed because the check did not represent the full amount he was owed, and because he never cashed the check, which was sent to him after litigation commenced. And, even if the amount offered fully compensated him for his lost wages, Casagrande insists that no effort was made to compensate him for the time he went without these wages before receiving the check on June 18.

The district court held that Casagrande "ha[d] not demonstrated that he suffered harm as a result of Defendants' FMLA interference," noting that because "OhioHealth provided Plaintiff with paid disability leave for all of the relevant periods," he was "not improperly denied any wages from the period of December 5, 2012 through February 26, 2013." The court also reasoned that "[i]f Plaintiff suffered harm as a result of Defendants' delay in job reinstatement[,] . . . it is clear that Defendants attempted to remedy their mistake by providing those lost wages." The record establishes that the arithmetic does not add up quite that neatly, however.

In the first place, Casagrande's temporary disability pay was 70 percent of his salary, and it ended on February 12. As a result, he suffered a decrease in pay during any period in which he was receiving temporary disability pay instead of his normal wages, and he received no pay at all from February 12 until he was restored to his job on March 18. On June 18, OhioHealth mailed Casagrande a check for $1,474.63, which represented its calculation of the pay Casagrande would have received had he worked his normal schedule between February 27 and March 18. Casagrande did not cash the check; instead, his attorney wrote a letter to the defendants' attorney declining the offer because the check did not reflect what Casagrande was owed. Casagrande submits that he would have earned $2,455.92 between February 27 and March 18 and notes further that, even if the check fully compensated him, he was harmed by the 90-day delay in receiving it. Therefore, the district court's statement that it is undisputed that Casagrande was provided with paid leave and was not harmed because he was offered back-pay is clearly erroneous. These matters clearly are in dispute, and the district court thus erred in granting summary judgment to the defendants. A jury should weigh the evidence and determine whether Casagrande was harmed by the delay in job restoration and whether the check offered by OhioHealth fully compensated him for the harm.

**Retaliation Claim**

"This court applies the familiar burden-shifting test articulated in *McDonnell Douglas . . .* to retaliation claims under the FMLA." *Edgar*, 443 F.3d at 508 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). First, Casagrande must make out a *prima facie* case of retaliation by showing that: "(1) he engaged in protected activity, (2) his employer was aware of the protected activity, (3) he was subject to an adverse employment action, and (4) there was a causal nexus between the protected activity and the adverse employment action." *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014). "A plaintiff's burden in establishing a prima facie case is not intended to be an onerous one." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). If Casagrande succeeds, then the burden shifts to OhioHealth to show that it had a legitimate, nondiscriminatory reason for firing him. *Edgar*, 443 F.3d at 508. If OhioHealth is able to do so, then the burden shifts back to Casagrande to demonstrate that OhioHealth's reason is pretextual—that is, that the reason given is false and that discrimination is the real reason. *Seeger*, 681 F.3d at 285; *Skrjanc*, 272 F.3d at 315.

The only element of the *prima facie* case that is disputed here is whether Casagrande was disciplined and ultimately terminated from his job with OhioHealth because he inquired about his FMLA rights, took FMLA leave, and exercised his right to job restoration when he returned from FMLA leave. To show a causal connection, Casagrande relies on the temporal proximity of his return from FMLA leave to his discipline and ultimate termination, emphasizing the evidence that his work received heightened scrutiny when he returned from leave. OhioHealth responds that there is no temporal proximity in this case, given that Casagrande remained employed for eight months after he returned from FMLA leave and that Casagrande's

performance issues and resulting discipline began before he was even FMLA-eligible. The district court held that the evidence, construed in the light most favorable to Casagrande, could support a jury's determination that he faced increased scrutiny, which, combined with the temporal proximity, established a *prima facie* case. The district court nevertheless entered judgment for the defendants, having found that Casagrande's performance problems were a legitimate basis for his termination and that he could not show pretext.

OhioHealth's asserted reasons for terminating Casagrande's employment were concerns about "patient safety" and Casagrande's failure to follow nursing policy. OhioHealth's burden is one of production, not persuasion, *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 589 (6th Cir. 2009), and OhioHealth offered reasonable bases to satisfy this burden. Although Casagrande contends in his brief that OhioHealth cannot provide a legitimate, non-retaliatory reason for terminating his employment, he provides no evidence or analysis in support of this contention, and it does not appear to be actually in dispute.

Instead, the parties appropriately focus on the pretext analysis, which clearly is a matter of dispute. "A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Seeger*, 681 F.3d at 285. Based on Casagrande's argument that there was a genuine dispute of material fact as to whether OhioHealth's purported reasons for terminating him were pretextual, the district court analyzed each of the three methods of showing pretext and determined that Casagrande's arguments failed under each of them as a matter of law.

An employee establishes that an employer's proffered reason has "no basis in fact" by "showing that the employer did not actually have cause to take adverse action against the employee based on its proferred reason." *Seeger*, 681 F.3d at 285 (citation omitted). Even if the

reason has no basis in fact, it is not pretextual if the employer honestly believed that it did. *Id.* Thus, to succeed, Casagrande must demonstrate both that OhioHealth's proferred reasons had no basis in fact and that OhioHealth did not honestly believe that they did. *Id.* "[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (internal quotation marks and citation omitted).

Here, it is clear that OhioHealth's proferred reasons for terminating Casagrande's employment did have a basis in fact or, at a minimum, were the result of an honest belief. Indeed, Casagrande admits in his deposition that most of the alleged performance issues occurred, although he attempts to explain the reasons for them or to provide mitigating circumstances. Our review indicates that OhioHealth's decision was also reasonably informed and considered. It was not hasty—Sayers did not think Casagrande would make it in the unit as early as August 2012 and considered ending his employment in April 2013, yet Casagrande's employment ultimately was not terminated until October 2013. Furthermore, OhioHealth undertook reasonable investigation prior to ending Casagrande's employment, as evidenced by the fact that it decided not to fire him in April after hearing his version of events and that, in September and October, it investigated the allegations against him and determined that two of the four performance issues for which he had been placed on fact-gathering suspension were unmerited. Casagrande has not shown that OhioHealth's proferred rationale for firing him had no basis in fact. For many of the same reasons, Casagrande has not shown that OhioHealth's rationale was insufficient to justify his termination.

However, Casagrande has submitted enough evidence from which a reasonable jury could conclude that OhioHealth's proferred reasons for ending his employment did not actually motivate his termination. Although Casagrande has not pointed to direct evidence in the record,

there is indirect evidence, which, when taken in the light most favorable to Casagrande, could lead a reasonable jury could to conclude that Casagrande's termination was motivated by the exercise of his FMLA rights, rather than by performance issues.

Casagrande's pretext argument relies in part on the deposition testimony of his coworkers Sherry Pappas and Tamara Fluty. Pappas and Fluty each testified that from the time when Casagrande came back from his leave of absence in March 2013, in their opinions, Sayers scrutinized his performance more closely than that of other nurses. The district court did not credit this testimony, holding that it lacked a proper foundation because neither Pappas nor Fluty was involved with or had personal knowledge of the decision to fire Casagrande. "We review decisions regarding the admission and exclusion of evidence for abuse of discretion." *Upshaw*, 576 F.3d at 593.

Casagrande argues that the Pappas and Fluty testimony is admissible and that it supports his argument that the reasons given for firing him were pretextual. Portions of the deposition testimony are undoubtedly inadmissible hearsay, such as Pappas's statement that "somebody told me in confidence that [Sayres told a co-worker] to . . . make sure he's gone before I come back, when she went on vacation." However, there are also relevant portions in which the deponents offer an opinion based on personal knowledge. Pappas and Fluty were both nurses with years of experience on the 7 Orange unit. Prior to Casagrande's termination, both Pappas and Fluty were aware that Casagrande was being disciplined, and both were aware of at least some of the reasons for the discipline. Pappas testified that Casagrande was treated unfairly and disciplined unnecessarily in the period immediately after he returned from leave. Pappas also testified that a supervisor warned her to call security if she saw Casagrande doing anything inappropriate. Meanwhile, Fluty sent Casagrande a text message prior to his termination saying that she and

others could "see what's going on" and later testified that she felt his supervisors were nitpicking and trying to find relatively unimportant things for which to discipline him. At least some of these statements were based on personal knowledge and, thus, were admissible. Although Pappas and Fluty did not have personal knowledge of why Casagrande was fired, they could testify to indirect evidence that would support an inference that his termination was retaliatory. As a result, the district court's blanket statement that the coworkers' depositions lacked a basis in personal knowledge overlooked admissible evidence of a disputed material fact.

In addition to his coworkers' testimony, the increased scrutiny to which Casagrande was subjected and the temporal proximity of the increased scrutiny to his return from leave could support a finding of pretext. *See Seeger*, 681 F.3d at 285 (noting that "temporal proximity cannot be the sole basis for finding pretext," but it may be a strong indicator when accompanied by additional, independent evidence) (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012)). In the five months between the end of his initial orientation and the beginning of his first leave of absence, Casagrande had only one documented performance issue. After Casagrande returned from his first, non-FMLA leave of absence, he received two written reprimands, one for attendance and one for incomplete documentation, and Sayers first expressed her belief that Casagrande would not make it on 7 Orange.

When Casagrande returned from his second leave of absence, at least partly covered by FMLA, and began caring for patients again on April 1, the criticisms came in quick succession. He received verbal reprimands on April 18 and April 21 based on anonymous "unusual occurrence" reports, followed by a third such report filed on April 23, concerning his patient's missing identification band. Although Sayers testified that she could not remember an "unusual occurrence" report ever being filed against another nurse for a patient's missing identification

band, she drafted a final written warning against Casagrande based on this conduct. This activity is similar to the situation in *Upshaw*, 576 F.3d at 590, in which we held that the plaintiff established a genuine dispute of fact as to pretext when she showed, among other evidence, that two of the proffered reasons for terminating her employment typically did not warrant formal discipline or termination.

Ultimately, Sayers did not issue the written warning for the identification-band incident. Nevertheless, the pattern continued: Casagrande received four verbal reprimands in May and June and a final written warning on July 1, for incidents that occurred in mid-June. Whether this situation was justified because Sayers thought Casagrande's performance had suffered from his four-month absence from work, or whether it was retaliatory because his two periods of leave and his reliance on the FMLA made him expendable in Sayers's eyes, presents a classic jury question. It is an issue that cannot be determined as a matter of law and should not have been resolved at the summary judgment stage.

When the evidence is viewed in the light most favorable to Casagrande, the admissible portions of the Pappas and Fluty depositions and the increased scrutiny and discipline to which Casagrande was arguably subjected immediately after he returned from leave establish a genuine dispute of material fact as to whether the reasons OhioHealth offered for Casagrande's termination were pretextual. At trial, the district court can assume its gatekeeping role to allow only admissible testimony from Pappas and Fluty, leaving the jury to weigh that testimony along with the other evidence, judge the credibility of the witnesses, and determine whether Casagrande was wrongfully terminated.

**CONCLUSION**

In this case, we conclude that the plaintiff has established interference with his rights under the FMLA, as a matter of law, based on OhioHealth's lack of notification to him of the consequences of his failure to produce a medical release to return to work. Moreover, there are genuine disputes of material fact as to whether Casagrande was properly compensated for the defendants' delay in restoring him to his job after he provided a medical release on February 27, 2013, and as to his entitlement to restoration in January 2013. Finally, there are disputed facts that must be submitted to a jury to determine whether the defendants' stated reason for Casagrande's termination was pretextual, thereby allowing a finding that he was subjected to retaliation under the FMLA. We therefore REVERSE the district court's judgment in favor of the defendants and REMAND the case for further proceedings consistent with this opinion.

ROGERS, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority that Casagrande has provided enough evidence to create a genuine issue of material fact regarding the delay in his reinstatement, but in my view this was not enough to conclude that he is entitled to judgment on this issue as a matter of law. With respect to the retaliation issue, the district court properly ruled for the defendant.

I.

On the interference claim, record evidence supports a conclusion that Casagrande was entitled to be reinstated to his job in January of 2013. It is undisputed that Casagrande's leave qualified for FMLA protection in December of 2012. Further, Casagrande informed OhioHealth of his desire and ability to return to work on January 18, 2013. It is also undisputed that OhioHealth did not reinstate Casagrande to his position on 7 Orange until March of 2013. Employees able to return from FMLA-eligible leave are entitled, under the FMLA, to be reinstated to their prior position or an equivalent position without delay. *See* 29 U.S.C. § 2614(a)(1)(A)–(B); *Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238, 249 (6th Cir. 2004). Although the defendants argue that any delay was due to Casagrande's failure to provide a return-to-work release per OhioHealth's policy, there is evidence raising a dispute over whether such a policy existed. To be sure, an employer can have a policy requiring a return-to-work release[1] before reinstating an employee on FMLA leave. 29 C.F.R. § 825.312(a). But this policy must be uniformly applied, *id.*, and Casagrande has elicited sufficient evidence to dispute whether OhioHealth applied its policy uniformly. OhioHealth indeed sent several letters to Casagrande that stated a requirement for him to provide a return-to-work release prior to being reinstated. OhioHealth's actions, however, conflict with this supposed policy. Not only did

---

[1] The FMLA regulations use the term "fitness-for-duty certification," 29 C.F.R. § 825.312, and OhioHealth uses "return-to-work release," but these terms are interchangeable.

OhioHealth let Casagrande return from his previous medical leave without providing a release, but at least one OhioHealth official also discouraged Casagrande from providing a release after he stated his ability to return to work. This contradicts OhioHealth's assertion that the delay in failing to provide a release was Casagrande's fault. Because there is a dispute over whether Casagrande had to provide a return-to-work release prior to being reinstated, there is a dispute over whether he was entitled to reinstatement in January 2013. The district court thus erred in concluding otherwise.

Casagrande has made the remaining necessary showings for his interference claim. Other than the entitlement element analyzed above, the defendants on appeal do not dispute that Casagrande has satisfied the elements of his interference claim. What the defendants do dispute, however, is whether Casagrande was harmed by the delay. The district court held that Casagrande could not show harm—a requirement for an interference claim, *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507–08 (6th Cir. 2006)—because OhioHealth gave him a check for back wages for the twenty-day delay between when he submitted his return-to-work release in February and when he was actually reinstated in March. On appeal, the defendants make the same argument. It is not disputed that the offered wages cover only the February–March delay. OhioHealth did not offer Casagrande any back wages for January even though, if that was the start date of OhioHealth's FMLA interference, that would be when Casagrande's harm began. Thus, because the offer for back wages covered only the delay from February to March and did not cover January, Casagrande has elicited sufficient evidence to satisfy the harm inquiry, and the district court erred in awarding summary judgment to the defendants on the interference claim.

II.

Assuming that Casagrande has asserted a prima facie case with regard to retaliation, the defendants had a legitimate, non-retaliatory reason for firing him.[2] OhioHealth's reasons for firing Casagrande were patient-safety concerns and a failure to follow nursing policy. These are certainly legitimate reasons that on their face have nothing to do with retaliation. Although Casagrande states in a heading in his brief that OhioHealth cannot provide a legitimate, non-retaliatory reason for terminating his employment, he provides no evidence, case citations, or further analysis of this issue. Thus, the defendants have shown that there was a non-retaliatory basis for Casagrande's termination.

The record evidence supports none of Casagrande's theories as to pretext. There are three ways a plaintiff can show pretext: "showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Seeger v. Cincinnati Bell Telephone Co.*, 681 F.3d 274, 285 (6th Cir. 2012). None of these theories is availing for Casagrande. First, the patient-safety and following-policy concerns that motivated the defendants' termination of Casagrande had bases in fact. Casagrande admitted in his deposition that most of the alleged performance issues occurred, though he attempted to explain the reasons for them or mitigating circumstances. The sheer number of performance concerns gave OhioHealth a factual basis for ending Casagrande's employment. Furthermore, OhioHealth undertook reasonable investigation prior to ending Casagrande's employment, as evidenced by the fact that it decided not to fire him in April after hearing his version of events and that, in October, it investigated the allegations against him and determined that two of the four performance issues for which he had been placed on fact-gathering

---

[2] FMLA retaliation claims fall under the familiar *McDonnell Douglas* framework. *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).

suspension were unmerited. Casagrande has not shown that OhioHealth's proffered rationale for firing him had no basis in fact. For these same reasons, Casagrande has not shown, under the third theory of pretext, that OhioHealth's rationale was insufficient to justify his termination.

Casagrande has also failed to elicit sufficient evidence to create a dispute of material fact over whether the performance concerns actually motivated his termination. Casagrande has pointed to no direct evidence in the record. He does, however, point to the deposition testimony of two of his coworkers, Sherry Pappas and Tamara Fluty, to establish pretext. But, as the district court held, all of Pappas's and Fluty's testimony is either based on hearsay or without personal knowledge of the heightened scrutiny. Pappas testified that "it did seem to [her] that [Sayers] was treating [Casagrande] unfairly," but this was in the context of her conversations with Casagrande. Thus, although what Casagrande relayed to Pappas might have sounded unfair, that is not sufficient evidence to support this pretext theory; indeed, it is no better than Casagrande's bare allegations. Moreover, although Pappas stated that Casagrande "was being written up for things that anybody could have done," this was a direct quote taken from Casagrande in their conversations. Pappas never stated that she personally observed any heightened scrutiny as to Casagrande's performance. And Fluty provided much of the same. Fluty testified that after Casagrande returned from his FMLA-eligible leave, Sayers called her one night to investigate a report about Casagrande. In this call, Sayers simply reminded Fluty of her "job as a charge nurse to report" any problems that occur and that Sayers expected Fluty to do her job. In response to a question as to whether she felt pressured by Sayers, Fluty stated "I don't know. I guess in the beginning. But, you know, I don't know." This contradictory testimony does not create a dispute as to pretext. Furthermore, although Fluty stated that Sayers might have been "nitpicking" Casagrande's performance, she admitted that this was hearsay,

even saying "I didn't experience [i.e., observe] any of [the alleged scrutiny]." "Hearsay evidence may not be considered on summary judgment." *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999). Because Casagrande has elicited no admissible evidence that demonstrates heightened scrutiny as to his job performance after his return from FMLA leave, he cannot avail himself of the second theory of pretext.

Without any admissible evidence showing that the defendants' legitimate reason for his termination was not the actual one, Casagrande's retaliation claim fails. He attempts to argue that the "changing justifications" for his termination are sufficient to show pretext. That the defendants ultimately based their termination of Casagrande on two incidents instead of the four incidents originally stated does not amount to a "changing justification." As Casagrande admits, the defendants investigated the incidents and simply removed the two that were least supported. Removing two incidents from a four-incident list does not show that the remaining reasons or underlying concerns were pretextual. Moreover, Casagrande admitted in his deposition that most of the alleged performance issues occurred, though he attempted to explain the reasons for them or mitigating circumstances. The "changing justifications" argument therefore is without merit. Because Casagrande has made no other arguments on appeal regarding pretext, and because an argument not made on appeal is waived, *City of Cleveland v. Ameriquest Mortgage Securities, Inc.*, 615 F.3d 496, 501 n.5 (6th Cir. 2010), the district court's award of summary judgment to the defendants on the retaliation claim should stand.[3]

---

[3]Furthermore, an inference of pretext does not follow from evidence that Casagrande had only one documented performance issue before his first leave of absence, but then received two written reprimands after returning from his first leave of absence, as well as several verbal reprimands and a written warning after returning from his second leave. Without Pappas's and Fluty's inadmissible testimony, the evidence in the record shows only that Casagrande was disciplined more often in the months leading up to his termination. Even viewed in the light most favorable to Casagrande, this evidence simply does not show that OhioHealth terminated Casagrande for any reason other than Casagrande's disregard for patient safety and failure to follow nursing policy.

III.

For the foregoing reasons, I would affirm the district court's grant of summary judgment as to the retaliation claim and reverse as to the interference claim.